**In re Adewunmi ADENIJI, Respondent**

**File A41 542 131 - York**

Decided November 3, 1999

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  Section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), does not apply to aliens whose most recent release from custody by an authority other than the Immigration and Naturalization Service occurred prior to the expiration of the Transition Period Custody Rules.

(2)  Custody determinations of aliens in removal proceedings who are not subject to the provisions of section 236(c) of the Act are governed by the general custody provisions at section 236(a) of the Act.

(3) By virtue of 8 C.F.R. § 236.1(c)(8) (1999), a criminal alien in a custody determination under section 236(a) of the Act must establish to the satisfaction of the Immigration Judge and the Board of Immigration Appeals that he or she does not present a danger to property or persons.

(4) When an Immigration Judge bases a bond determination on evidence presented in the underlying merits case, it is the responsibility of the parties and the Immigration Judge to ensure that the bond record establishes the nature and substance of the specific factual information considered by the Immigration Judge in reaching the bond determination.

Michael Maggio, Esquire, Falls Church, Virginia, for respondent

Interim Decision #3417

Brett M. Parchert, Appellate Counsel, for the Immigration and Naturalization Service

Before: Board En Banc:  DUNNE, Vice Chairman; SCIALABBA, Vice Chairman; HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, and MILLER, Board Members.  Concurring and Dissenting Opinion:  ROSENBERG, Board Member.  Dissenting Opinions: SCHMIDT, Chairman; joined by VACCA, VILLAGELIU, and GUENDELSBERGER, Board Members; GRANT, Board Member, joined by MOSCATO, Board Member.

FILPPU, Board Member:

The Immigration and Naturalization Service has appealed the Immigration Judge's March 10, 1998, bond decision ordering the respondent released on his own recognizance.  The Immigration Judge's bond decision was based on the Transition Period Custody Rules ("Transition Rules" or "TPCR") enacted by section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 ("IIRIRA").  See Matter of Noble, 21 I&N Dec. 672 (BIA 1997).  The Transition Period Custody Rules have expired, however, and a number of issues arise by virtue of that expiration.

## I.  ISSUES

The principal issues before us concern the following:

1) Whether we have jurisdiction over a bond appeal when the underlying order was rendered during the existence of the Transition Rules;

2) Whether the respondent is currently subject to mandatory detention under section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), in the wake of the expiration of the Transition Rules;

3) Whether the respondent, if he is not subject to mandatory detention, must show that he is not a danger to property or persons in order to obtain bond under the general bond provisions of section 236(a) of the Act; and

4) Whether we may look to the record in the underlying merits case (that is also on appeal to the Board) to find support for the Immigration Judge's bond ruling, where the allegedly relevant material was not introduced into the bond record before us.

As we explain in detail below, we find that we have continuing jurisdiction over this bond appeal. On the issue of whether the respondent is subject to mandatory detention, we accept the view currently advanced by both parties that the respondent's custody proceedings are governed by the general bond provisions of section 236(a) of the Act and that the criminal alien bond provisions of section 236(c) do not apply because the respondent was released from criminal custody prior to the expiration of the Transition Rules.

Under our case law addressing general bond provisions of prior law, an alien ordinarily would not be detained unless he or she presented a threat to national security or a risk of flight. See Matter of Patel, 15 I&N Dec. 666 (BIA 1976). But we agree with the parties' conclusions that an assessment of the alien's danger to property or persons is a relevant consideration under section 236(a) of the Act, even though we differ with regard to the reasons for that conclusion. In this respect, we find the regulation at 8 C.F.R. § 236.1(c)(8) (1999) to be controlling. See Matter of Drysdale, 20 I&N Dec. 815 (BIA 1994). Finally, we find that a remand of this case is necessary to develop the record further to determine whether the respondent, a criminal alien, poses a danger to property or persons or is a flight risk, because we consider it inappropriate to look to portions of the record in the merits appeal that were not referenced in or made part of the bond record.

## II. PROCEDURAL HISTORY

A Notice to Appear (Form I-862) was issued on April 17, 1997, charging the respondent with removability under section 237(a)(1)(A)

3

of the Act, 8 U.S.C. § 1227(a)(1)(A) (Supp. II 1996), as an alien who was inadmissible at the time of his entry as a lawful permanent resident. The Service alleged two underlying grounds of inadmissibility. First, it charged that the respondent was inadmissible under section 212(a)(9)(A)(i) of the Act, 8 U.S.C. § 1182(a)(9)(A)(i) (Supp. II 1996), as an alien who had been ordered removed and had sought admission in 1987 within 5 years of removal without obtaining prior consent from the Attorney General to reapply for admission. Second, the Service charged the respondent with inadmissibility under section 212(a)(6)(C)(i) of the Act for having procured his immigrant visa by fraud or willful misrepresentation because he failed to disclose that he had been arrested and deported.

In addition, on December 4, 1997, the Service charged the respondent under section 237(a)(2)(A)(iii) of the Act as an alien convicted of an aggravated felony, as defined in sections 101(a)(43)(G), (M), and (U) of the Act, 8 U.S.C. §§ 1101(a)(43)(G), (M), (U) (Supp. II 1996). This charge was based upon the respondent's conviction on December 27, 1996, and sentence to imprisonment of 1 year and 1 day, for the offense of conspiracy to commit bank fraud through acts intended to fraudulently withdraw a total of $18,300 from the bank accounts of two other persons.

On March 10, 1998, the Immigration Judge found the respondent removable as an aggravated felon under section 237(a)(2)(A)(iii) of the Act and granted him withholding of removal under section 241(b)(3) of the Act, 8 U.S.C. § 1231(b)(3) (Supp. II 1996). The Immigration Judge then conducted a bond hearing and ordered the respondent released on his own recognizance. The Service appealed both rulings. We address the bond appeal in this decision.

### III.  POSITIONS OF THE PARTIES

We requested supplemental briefs and held oral argument on the issue of the respondent's continued eligibility for release after the expiration of the Transition Period Custody Rules. Immediately prior to oral argument, the Service reversed its position and argued that section 236(c) of the Act requires mandatory detention of a

criminal alien only if he or she was released from criminal custody after October 8, 1998, the last day that the Transition Period Custody Rules were in effect.

The Service further argued that it is appropriate to consider whether the alien is a danger to the community, and that cases such as Matter of Drysdale, supra, and Matter of Andrade, 19 I&N Dec. 488 (BIA 1987), are relevant to a criminal alien's custody determination, even under the general bond provisions set forth in section 236(a) of the Act. Applying those factors here, the Service requests that we uphold the district director's decision refusing to release the respondent on any bond condition or, alternatively, that we set a substantial bond.

Because of the Service's change in position, the parties are in agreement on the dispositive issues except the amount of bond. The respondent agrees that section 236(a) of the Act should govern and, at oral argument, agreed that any threat posed to the community is a relevant consideration where the bond record contains evidence of criminal or terrorist activity.

In a postargument brief, the respondent asserts that we should consider in this bond appeal the Immigration Judge's reasons for granting withholding of removal, as set forth in the merits decision in the underlying removal proceedings. The respondent argues that the Immigration Judge's reasons for granting withholding of removal had a bearing on the custody ruling.

Finally, at oral argument, the respondent questioned whether we have continuing jurisdiction over this bond appeal, suggesting that a bond determination made under the Transition Period Custody Rules is not a custody determination pursuant to 8 C.F.R. § 236.1.

## IV. CONTINUING JURISDICTION OVER THE INSTANT APPEAL

We have appellate jurisdiction over bond rulings of Immigration Judges by virtue of 8 C.F.R. §§ 3.1(b)(7), 3.19(f), and 236.1(d)(3)(i) (1999). Notwithstanding any lack of clarity regarding appeals of Transition Rule bond orders in the current versions of 8 C.F.R. § 236.1(c) or § 236.1(d)(1), the initial

regulations to implement the IIRIRA intended, with respect to criminal aliens who fell under the Transition Period Custody Rules, to retain the prior structure for Immigration Judge bond redeterminations and appeals. <u>See</u> 62 Fed. Reg. 444, 450 (Jan. 3, 1997) (noting, with regard to proposed rulemaking to implement the IIRIRA, that "the proposed rule essentially preserves the status quo for bond determination by the Service and bond redetermination proceedings before immigration judges"); 62 Fed. Reg. 10,312, 10,323 (Mar. 6, 1997) (rejecting a commenter's assertion that "it was not the intention of Congress that EOIR continue to exercise bond redetermination authority under the Transition Rules").

Importantly, at the time of the respondent's bond redetermination hearing and the Service's appeal, 8 C.F.R. § 236.1(c)(1)(ii) (1998) provided that "[w]hile the Transition Period Custody Rules remain in effect, this paragraph and <u>paragraph (d)</u> of this section shall be subject to those Rules." (Emphasis added); <u>see also</u> 62 Fed. Reg. 15,362, 15,363 (1997). We understand this provision to incorporate the Transition Period Custody Rules into the existing regulatory structure for district director bond determinations, Immigration Judge bond redeterminations, and appeals to the Board. Subsequent to the respondent's bond hearing and the filing of this appeal, more detailed bond regulations were promulgated. But these regulations also envisioned some Immigration Judge bond adjudications under the Transition Rules, as well as appeals to us. 63 Fed. Reg. 27,441 (1998); 8 C.F.R. § 3.19(f). The absence of a reference to the Transition Rules in 8 C.F.R. § 236.1(d)(1), therefore, does not reflect an intent to completely remove jurisdiction over Transition Rule bond cases from either Immigration Judges or the Board.

Our appellate jurisdiction over this case has not been extinguished by a change in the substantive bond law that was applied by the Immigration Judge.[1] We have independent authority to assess the

---

[1] We would, however, lack jurisdiction to order the respondent released on bond were we to find that he is subject to the mandatory detention provisions of section 236(c) of the Act, as the regulations do not allow Immigration Judge custody redeterminations in such cases. 8 C.F.R. § 3.19(h)(2)(i)(D). However, we agree that
(continued...)

record and make our own bond determination under the current law. <u>Matter of Burbano</u>, 20 I&N Dec. 872 (BIA 1994). A remand might be necessary if the factors relevant to bond under the current law were not those that were germane at the time of the hearing before the Immigration Judge, or if, as here, there were other defects in the way the factors were applied below. <u>See</u> <u>Matter of Noble</u>, <u>supra</u>, at 686.

Furthermore, it does not appear that the dispute has become moot. We have been informed that on July 22, 1999, the district director issued an order (evidently pursuant to the Service's new interpretation of the statute) requiring that the respondent continue to be detained without bond. On July 26, 1999, the Immigration Judge entered an order declaring that the Service's new determination did not provide a reason for the Immigration Judge to alter his earlier decision releasing the respondent on his own recognizance. Under these circumstances, the dispute between the parties persists. Although some of the issues have changed, neither party asserts that this appeal is moot by virtue of the Service's new legal position or by virtue of its subsequent review and reaffirmation of its ultimate conclusion that the respondent should be detained without bond. <u>Matter of Valles</u>, 21 I&N Dec. 769 (BIA 1997).

## V. APPLICABILITY OF SECTION 236(c) FOLLOWING EXPIRATION OF THE TRANSITION RULES

The Transition Period Custody Rules were invoked by the Attorney General pursuant to section 303(b)(2) of the IIRIRA, 110 Stat. at 3009-586, which provides:

> NOTIFICATION REGARDING CUSTODY.—If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and

---

[1](...continued)
the respondent is not subject to mandatory detention.

> Immigration and Naturalization Service personnel available to carry out section 236(c) of the Immigration and Nationality Act, as amended by subsection (a), or the amendments made by section 440(c) of Public Law 104-132, the provisions in paragraph (3) shall be in effect for a 1-year period beginning on the date of such notification, instead of such section or such amendments. The Attorney General may extend such 1-year period for an additional year if the Attorney General provides the same notice not later than 10 days before the end of the first 1-year period. After the end of such 1-year or 2-year periods, the provisions of such section 236(c) shall apply to individuals released after such periods.

The IIRIRA was enacted on September 30, 1996. On October 9, 1996, within the 10-day period specified by section 303(b)(2) of the IIRIRA, the Attorney General, through the Commissioner of the Service, made the necessary notifications. The Attorney General subsequently invoked the additional 1-year extension allowed under section 303(b)(2) of the IIRIRA. The additional 1-year extension expired at the end of the day on October 8, 1998. The Transition Rules themselves specified that they would only control criminal alien custody determinations "[d]uring the period in which this paragraph is in effect pursuant to paragraph (2)," as quoted above. IIRIRA § 303(b)(3)(A). The statute contains no explicit savings clause pertaining to the Transition Period Custody Rules, and we agree with the parties that those rules expired at the end of their second year.

Section 236(c) of the Act would have become effective on April 1, 1997, had the Attorney General not invoked the Transition Rules, and thus would have governed the release of covered criminal aliens during the course of removal proceedings on or after April 1, 1997. Section 236(c) provides in relevant part as follows:

> (1) CUSTODY.—The Attorney General shall take into custody any alien who—
>
> (A) is inadmissible by reason of having committed any offense covered in section 212(a)(2)[1182],

8

     (B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D)[1227],

     (C) is deportable under section 237(a)(2)(A)(i) on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

     (D) is inadmissible under section 212(a)(3)(B) or deportable under section 237(a)(4)(B),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

     (2) RELEASE.—The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides . . . that release of the alien from custody is necessary [for certain witness protection matters], and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

The respondent makes two interrelated arguments opposing the application of section 236(c) to his current situation. He attacks our decision in Matter of Noble, supra, contending that the literal language of section 236(c) provides for its application to an alien only if the Service immediately takes custody of the alien "when the alien is released" from criminal incarceration (the "when released" language). Additionally, the respondent, now supported by the Service, contends that the last sentence of section 303(b)(2) of the IIRIRA makes section 236(c) applicable only to individuals released from criminal custody after the expiration of the 2-year period during which the Transition Rules were in effect (the "released after" language). We need not address at this time the respondent's arguments respecting Matter of Noble and the "when released" clause,

as we accept the parties' construction of the "released after" clause in the last sentence of section 303(b)(2).[2]

Proper statutory construction must begin with the words used by Congress. INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987). As previously noted, the last sentence of section 303(b)(2) of the IIRIRA provides that after the end of the transition period, "the provisions of such section 236(c) shall apply to individuals released after such periods."

We confronted the meaning of this sentence in Matter of Noble without coming to any resolution on how it should be construed. We do not believe that this last sentence of section 303(b)(2), standing alone, is free from uncertainty. The natural sense of the words, at first glance, would seem to point in the direction presently advanced by the parties. But the term "released" is not expressly tied to any other language that would clarify whether it refers to release from criminal custody, Service custody, or some other form of detention.

In our judgment, additional language is needed to clarify the sentence. The parties now propose that this sentence should be read to say that "the provisions of such section 236(c) shall apply to individuals released [from criminal custody] after such periods." The reading previously given this sentence, by a three-member panel of the Board in a series of unpublished cases, is not the one now advanced. Those unpublished cases construed the sentence to say that "the provisions of such section 236(c) shall apply to individuals [seeking to be] released after such periods."

The difference is profound. The reading in our unpublished cases extends the mandatory detention provisions of section 236(c) to any covered criminal or terrorist alien in Service detention after the

---

[2] Given the construction of the "released after" sentence that we adopt today, the effect of the "when released" clause would appear to be of concern principally in the case of an alien who was released from criminal custody after the expiration of the Transition Rules, but who was not promptly taken into Service custody.

expiration of the Transition Rules.  The parties' proposed reading, on the other hand, extends mandatory detention only to aliens who have been released from criminal (and perhaps psychiatric and other nonService) confinement after the expiration of those rules.  This would permit bond for all aliens released from nonService custody before the Transition Rules expired, even if those aliens were not eligible for bond during the life of the Transition Rules themselves.[3]

The meaning assigned to the last sentence of section 303(b)(2) should be the one that emerges from a reading of the statute as a whole, taking into account its object and policy.  <u>John Hancock Mut. Ins. Co. v. Harris Trust & Sav. Bank</u>, 510 U.S. 86, 94-95 (1993). Minor gaps in a statute should be filled by extrapolating from the statute's general design.  <u>See</u> <u>United States v. Jackson</u>, 390 U.S. 570 (1968).

In <u>Matter of Noble</u>, <u>supra</u>, we expressed a reluctance to adopt the meaning of this "released after"sentence that the parties propose today.  We saw it as providing criminal and terrorist aliens a "springing" opportunity for release from Service custody under lenient standards not applicable to some of those aliens for approximately a decade.  For example, an aggravated felon who has <u>not</u> been lawfully admitted has never been eligible for release, under the permanent provisions of the statute and during the pendency of proceedings, since mandatory detention was first introduced in the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181  ("ADAA").  <u>See</u> ADAA § 7343, 102 Stat. at 4470; <u>see also</u> Immigration Act of 1990, Pub. L. No. 101-649, § 504, 104 Stat.

_____

[3] As indicated earlier, we accept the reading of the statute advanced by the parties.  This change from the approach taken in our unpublished panel rulings could very well alter the results in some of those earlier panel decisions.  Under our decision in <u>Matter of Valles</u>, <u>supra</u>, aliens affected by those panel dispositions are not required to seek reopening from the Board before seeking a new bond redetermination from an Immigration Judge.  In this respect, our ruling today amounts to a material change in circumstances under 8 C.F.R. § 3.19(e), such that a reexamination of bond by Immigration Judges may be warranted.

4978, 5049 ("1990 Act"); Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 306, 105 Stat. 1733, 1751 (effective as if included in the 1990 Act).

Even under the temporary Transition Period Custody Rules, an aggravated felon who was not lawfully admitted remained barred from release unless it was established that he or she was not a danger to persons or property, was not a flight risk, and would not be accepted by the country designated for removal. IIRIRA § 303(b)(3)(B)(ii). Under the position advanced by the parties, such an aggravated felon would now suddenly be eligible for bond so long as the alien's release from criminal custody occurred prior to the expiration of the Transition Rules. And this would be true even if that same felon already had been in Service custody for many months because bond was not available under the Transition Rules.

If this were the end of the analysis, we would have substantial difficulty accepting the proffered construction in view of the overall structure of the IIRIRA's custody provisions, as well as the historical context of the similar provisions that were being replaced. In Matter of Noble, supra, at 682, we found it incomprehensible that Congress could have intended that such an alien be released after the expiration of the Transition Rules, without any consideration of his or her dangerousness, at the same time that Congress was mandating the detention of criminal aliens. The Transition Rules were not intended as a benefit to criminal or terrorist aliens, but rather as a temporary postponement of stringent custody requirements if the Service was not immediately able to carry out its obligations under the permanent law. It would be anomalous to deem the expiration of the Transition Rules and the concomitant conversion to the stringent permanent law to be the occasion upon which Congress relaxed the rigors of the bond provisions through increased generosity toward all criminal aliens in Service custody on the date of that expiration.

There is, however, a scenario under which the parties' proposed reading of the last sentence of section 303(b)(2) makes sense in view of the legislation as a whole, notwithstanding the various unexpected results flowing from that reading. See Matter of Noble, supra, at 681-83. Congress enacted the Transition Rules knowing that the Service might lack the capacity to enforce the permanent

12

rules.  That lack of capacity might not be fully rectified during the 2-year Transition Period.  It therefore would make sense to apply the permanent rules to persons coming into Service custody after the Transition Period ended, and to continue to apply the Transition Rules to persons who had been subject to them during their existence.  This would lead to no anomalous "springing" opportunities to obtain bond for criminal aliens, such as aggravated felons who never were lawfully admitted and whose detention had been required under the Transition Rules.

The problem is that Congress did not enact a savings clause for the Transition Rules.  And we consider it beyond our authority to treat the IIRIRA, even implicitly, as containing one.  We have doubts whether Congress intended one at all, let alone what its precise terms might have been.  That doubt is reinforced to the extent that sudden bond eligibility arises for certain categories of aliens under the parties' reading of the statute.

We consequently perceive tension between the language of the last sentence of section 303(b)(2) and the overall thrust of the IIRIRA. Nevertheless, the parties' reading of the statute is not unreasonable, in light of its exact terms and the uncertainty we experience in discerning how Congress expected this provision to operate.  Further, the district courts around the country have not agreed with the construction of the statute contained in our unpublished panel rulings.  In response to these court decisions, the Service has changed its own view of the statute and has implemented that change in its own bond adjudications.  At oral argument, the Service indicated that there were no plans to challenge these federal district court decisions in the courts of appeals.  See Matter of Silva, 16 I&N Dec. 26, 29-30 (BIA 1976) (acceding to a construction of section 212(c) of the Act, 8 U.S.C. § 1182(c) (1976), under generally similar circumstances); see also id. at 32-33 (Appleman, concurring).

In this case, the natural sense of the language in question points to the construction jointly supported by the parties.  That interpretation of the "released after" language in the last sentence of section 303(b)(2) of the IIRIRA would not be inconsistent with the legislation as a whole if Congress intended, but neglected, to include a savings clause pertaining to persons who were subject to

13

the Transition Period Custody Rules during their existence.  In such circumstances, any unexpected results would arise from the absence of the savings clause.  In the end, we have found little that helps us determine what Congress actually intended when it adopted the language in that last sentence.

  In sum, we are uncertain of the intent behind the "released after" language and agree that its natural sense supports the parties' reading.  While the statute as a whole raises questions about that reading, we cannot rule out the possibility that the answer lies in a failure to enact a savings clause for persons subject to the Transition Rules.  Consequently, we are able to accept the parties' reading when we factor in the district court rulings rejecting our prior construction, the Service's reversal of its own position, and the Service's decision not to pursue the litigation in the court cases.  Given this overall set of circumstances, we find that the respondent is not subject to mandatory detention under section 236(c) of the Act because he was released from his nonService custodial setting (i.e., from criminal custody) prior to the expiration of the Transition Rules.


### VI.  STANDARDS GOVERNING BOND

  We agree with the parties that the general bond provisions of section 236(a) govern bond for the respondent at present.  The parties further agree that the respondent must show that he is not likely to abscond, is not a threat to the national security, and is not a threat to the community, in keeping with our decision in Matter of Drysdale, supra.  The "threat to the community" test in Drysdale followed the then-existing statutory language applicable to bond for criminal aliens.  Some similar test would seem to be warranted for criminal aliens who were previously covered by the Transition Rules, particularly if their eligibility for release under the general bond provisions of section 236(a) stems, in part, from the absence of a savings clause that continues the Transition Rules for persons once subject to those rules.

  There is, moreover, a regulation that we deem applicable to this situation, 8 C.F.R. § 236.1(c)(8) (1999), which provides, in relevant part, as follows:

14

> Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

An Immigration Judge is not authorized to issue a warrant of arrest. Nevertheless, 8 C.F.R. § 3.19(a) incorporates substantive aspects of the bond regulations governing the Service, and provides that "[c]ustody and bond determinations made by the service [sic] pursuant to 8 C.F.R. part 236 may be reviewed by an Immigration Judge pursuant to 8 C.F.R. part 236."

At oral argument, the Service expressed the view that 8 C.F.R. § 236.1(c)(8) became inapplicable, along with all the provisions of § 236.1(c)(2) through (8), upon expiration of the Transition Rules. The Service's view was based on the first sentence of 8 C.F.R. § 236.1(c)(1)(ii), which provides that "[p]aragraph (c)(2) through (c)(8) of this section shall govern custody determinations for aliens subject to the TPCR while they remain in effect."

At first blush, the regulatory language would suggest that paragraph (c)(8) died with the Transition Rules. But 8 C.F.R. § 236.1(c)(1)(ii) does not actually say that paragraph (c)(8) loses all force upon expiration of the Transition Rules. Rather, it simply states that it governs Transition Rule cases during the existence of the Transition Rules. It says nothing about how paragraph (c)(8) is to apply if the alien in question is <u>not</u> subject to the Transition Rules, either because those rules never applied to the alien or because they have now expired.

Importantly, the text of paragraph (c)(8) itself is not in any way restricted to Transition Rule aliens. Indeed, the text suggests just the opposite, as it applies to aliens "not described in section 236(c)(1) of the Act," many of whom will simply be aliens described in section 236(a), the general bond provision. The regulatory history confirms that paragraph (c)(8) was intended to have broader

15

application than merely being applicable during the existence of the Transition Rules.

   The substance of paragraph (c)(8) was promulgated as 8 C.F.R. § 236.1(c)(2) at the time that regulations implementing the IIRIRA were first adopted in 1997.  62 Fed. Reg. at 10,360; 8 C.F.R. § 236.1(c)(2) (1998).  That this was intended to be part of the permanent regulations is suggested not only by the text of the paragraph, but also by the commentary that accompanied its promulgation.  See 62 Fed. Reg. at 10,323 ("The Department intends to issue a separate proposed rule in the near future establishing both substantive limitations and procedural safeguards concerning the release of criminal aliens eligible to be considered for release under the Transition Rules.").  Proposed and final rulemaking, focusing principally on the Transition Period Custody Rules, did follow.  62 Fed. Reg. 48,183-87 (Sept. 15, 1997) (proposed rules); 63 Fed. Reg. 27,441-50 (May 18, 1998) (final rules).  It was the May 19, 1998, final rules that redesignated paragraph (c)(2) as (c)(8), where it now appears.  63 Fed. Reg. at 27,449.

   It was also that May 19, 1998, regulatory package that added 8 C.F.R. § 236.1(c)(1)(ii), providing that "[p]aragraph (c)(2) through (c)(8) . . . shall govern custody determinations for aliens subject to the TPCR while they remain in effect."  63 Fed. Reg. at 27,449.  The addition of this language, however, does not alter the fact that the pertinent portion of paragraph (c)(8) was part of the original rulemaking package to implement the permanent provisions of the IIRIRA.

   From the outset, therefore, the regulations under the IIRIRA have added as a requirement for ordinary bond determinations under section 236(a) of the Act that the alien must demonstrate that "release would not pose a danger to property or persons," even though section 236(a) does not explicitly contain such a requirement.  This test is certainly akin to the "threat to the community" test contained in Matter of Drysdale, supra, which the parties agree should apply in the case of this respondent.  We deem the regulatory provision at 8 C.F.R. § 236.1(c)(8) (1999) to contain the appropriate test, as it is binding on us and pertains directly to removal proceedings under the IIRIRA.  Consequently, to be eligible for bond, the respondent must demonstrate that his "release

16

would not pose a danger to property or persons, and that [he] is likely to appear for any future proceeding." Id.

## VII.  RESPONDENT'S REQUEST FOR RELEASE FROM CUSTODY

In a memorandum of decision dated April 21, 1998, the Immigration Judge set forth the reasons for his March 10, 1998, order releasing the respondent on his own recognizance.  The Immigration Judge considered the respondent's dangerousness and risk of flight.  Those same factors are relevant considerations in assessing the respondent's request for release from custody today under section 236(a) of the Act.

The bond record reflects that the respondent was ordered deported in 1983.  In 1984, the respondent filed a nonimmigrant visa application while residing in Nigeria.  Later that year, he entered the United States as a nonimmigrant.  After overstaying his authorized admission, the respondent married a United States citizen.  The respondent returned to Nigeria in 1985.  In 1986, he applied for an immigrant visa.  During the course of the respondent's interview, it was discovered that the respondent obtained his 1984 nonimmigrant visa by willfully misrepresenting material facts unrelated to his prior deportation.  He was nevertheless granted a waiver.  At that time, it had not yet been discovered that the respondent was the same individual who had been ordered deported in 1983, and the respondent did not seek or obtain permission to reenter the United States after deportation.

In 1990, after he had immigrated, the conditional basis of his permanent resident status was removed.  The respondent was later divorced from his petitioning spouse.  In 1993, he married his present spouse, a native of Nigeria.  The respondent and his current spouse have two United States citizen children.  The respondent's current spouse has been granted asylum.

On December 27, 1996, the respondent was convicted of the offense of conspiracy to commit bank fraud.  The bond record also indicates that the respondent was convicted of making false statements to the Service.  The respondent previously alleged that both convictions

were on appeal, but does not now contest removability based on the bank fraud conspiracy conviction.

The Immigration Judge's memorandum of decision contains little analysis on the issue of the respondent's danger to property or persons. The Immigration Judge ruled that the respondent had the burden of proof on this issue, but that the Service would be required to rebut an otherwise satisfactory showing by the respondent. Nevertheless, the Immigration Judge immediately proceeded to state that "[t]here is no showing that the respondent is a danger to persons or property which would necessitate holding the respondent in Service custody at this point." This would appear to place the burden on the Service to show that the respondent posed such a danger, as the Immigration Judge recounted no evidence that led him to conclude that the respondent had made a satisfactory showing requiring rebuttal. The only additional point discussed by the Immigration Judge involved an observation that the Service did not consider the respondent's bank fraud crime to be a "particularly serious crime" that would bar withholding of removal.

With respect to the risk of flight, the Immigration Judge merely noted that he had granted the respondent withholding of removal, reducing the likelihood that the respondent would fail to appear for any future hearings.

There is little to suggest that the respondent would pose a physical danger to persons if released. His bank fraud conviction and history of deceitful behavior, however, make the determination whether he presents a danger to property a difficult one. In view of his criminal record and history of other questionable or deceitful behavior, we do consider him to present a risk of flight should he lose his case on the merits.

Evidently in an effort to overcome some of the deficiencies in the record, the respondent asks that we consider the information presented to the Immigration Judge during the underlying removal proceeding in connection with this bond appeal. The respondent asserts that an Immigration Judge may base a custody determination on any information that is available, which in this case included the information presented during the removal hearing. Custody proceedings must be kept separate and apart from, and must form no

part of, removal proceedings.  See 8 C.F.R. § 3.19(d).  Information adduced during a removal hearing, however, may be considered during a custody hearing so long as it is made part of the bond record.

  The parties and the Immigration Judge are responsible for creating a full and complete record of the custody proceeding.  In this case, the Immigration Judge did reference his conclusion in the underlying removal hearing.  But a grant of withholding of removal by itself would not prevent the Service from attempting to effect removal to a third country, and the Immigration Judge's discussion seems to reflect an incomplete assessment of the risk of flight.  Moreover, we have no way of ascertaining exactly what evidence or other aspects of the removal hearing may have been deemed pertinent. Reliance on the removal record, even though it is also pending on appeal, would require our speculation regarding what, if any, information from this record may have played a part in the custody determination.  Thus, we will not consider the evidence presented during the respondent's removal proceedings, except to the extent that it is already part of this bond record.  In any bond case in which the parties or the Immigration Judge rely on evidence from the merits case, it is necessary that such evidence be introduced or otherwise reflected in the bond record (such as through a summary of merits hearing testimony that is reflected in the Immigration Judge's bond memorandum).  Otherwise, it will not be part of the bond record available for our review on appeal.

  As indicated earlier, we have significant concerns regarding the respondent's danger to property and his risk of flight.  The Immigration Judge's bond assessment is exceptionally sketchy as it pertains to the evidence in this case.  In fairness to the respondent, however, the Immigration Judge may well have relied on undisclosed evidence from the merits hearing in making the bond determination.  Accordingly, we will vacate the Immigration Judge's March 10, 1998, bond order, but we will remand the record for further proceedings to give the respondent an opportunity to make a more complete record and to allow the Immigration Judge to better explain the basis for his bond ruling, regardless of the outcome on remand.

## VIII.   CONCLUSION

19

Although he has been convicted of an aggravated felony, the respondent is eligible for consideration for bond under the general bond provisions of section 236(a)(1) of the Act because he was released from his criminal custody on or before October 8, 1998. Pursuant to 8 C.F.R. § 236.1(c)(8), the respondent must demonstrate that his release would not pose a danger to property or persons, and that he is likely to appear for any future proceedings.[4] A remand is appropriate because of the manner in which these tests were applied below. In view of the length of time this bond appeal has been pending, the Immigration Judge should hold the new bond hearing promptly.

ORDER: The appeal of the Immigration and Naturalization Service is sustained.

FURTHER ORDER: The Immigration Judge's March 10, 1998, bond order is vacated, and the record is remanded to the Immigration Court for further proceedings consistent with this decision.

CONCURRING AND DISSENTING OPINION: Lory Diana Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I agree with the majority's conclusion that the respondent is not subject to mandatory detention under section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), because he was not released from criminal incarceration[1] "after the

---

[4] The "threat to national security" test, while still pertinent in cases under section 236(a) of the Act, is not at issue here.

[1] For clarity's sake, I refer to the time spent in a penal institution pursuant to the incarceration portion of a criminal sentence levied under state or federal criminal laws as "incarceration" or "imprisonment," and the time spent in a jail or

(continued...)

20

expiration of the 2-year period" during which the Transition Period Custody Rules ("TPCR") were in force. Matter of Adeniji, Interim Decision 3417, at 8 (BIA 1999); see also Matter of Noble, 21 I&N Dec. 672, 680-81 (BIA 1997) (criticizing the concurring and dissenting opinion for its interpretation of the "released after" effective date language in section 303(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 ("IIRIRA"), relating to section 236(c) of the Act). I also agree that whether the respondent poses any danger to persons or property is a relevant consideration in determining the terms of release from detention by the Immigration and Naturalization Service under section 236(a) of the Act. See Matter of Andrade, 19 I&N Dec. 488, 489 (BIA 1987). I part ways with the majority, however, with respect to its analysis of the two principal statutory provisions at issue, and with respect to its decision to remand this case to the Immigration Judge.

As I discussed in my concurring and dissenting opinion in Matter of Noble, supra, our interpretation of the statutory phrases "released after" in section 303(b)(2) of the IIRIRA and "when the alien is released" in section 236(c) of the Act go hand in hand, referring, as did earlier statutory language, to the detention of a noncitizen by immigration authorities once he or she has completed a period of imprisonment for a criminal conviction. Id. at 695-97 (Rosenberg, concurring and dissenting). Moreover, while I agree with the dissenting opinion of Chairman Schmidt that the Immigration Judge's decision to release the respondent was based on a proper evaluation of the relevant bond factors and that "a remand is pointless," I find no reason in the "concerns expressed by the majority," to increase the amount of bond that must be posted to secure the respondent's release beyond the minimum of $1,500 required by the statute. Matter of Adeniji, supra, at 32 (Schmidt, dissenting); see also section 236(a) of the Act.

_____

(...continued)

detention facility pursuant to the Attorney General's civil authority under the Immigration and Nationality Act to arrest and detain aliens believed to be inadmissible or deportable as "detention" or "custody."

21

I agree with Chairman Schmidt that it is time to decide the respondent's bond appeal—which has been pending for well over a year—and to move on. Nevertheless, for jurisprudential reasons, I am compelled to address portions of the majority opinion, which I find to accede so grudgingly to the joint position asserted by the parties and to give no more than a passing mention to the virtually unanimous body of federal district court law rejecting our analysis in Matter of Noble, supra. I also find the dissenting opinion of Board Member Grant, which appears to challenge the result reached by the majority and seems to suggest that we should look to some abstract indicia of congressional intent apart from the plain language, or a reasonable agency interpretation, of the statute, to warrant discussion.

## I. DETENTION OF THE RESPONDENT UNDER SECTION 303(b)(2) OF THE IIRIRA AND SECTION 236(c) OF THE ACT

The Immigration Judge's redetermination of the respondent's detention by the Service originally was subject to the Transition Period Custody Rules enacted by Congress and activated by the Attorney General under section 303(b)(3) of the IIRIRA. Applying this then-controlling statutory authority, the Immigration Judge ordered the respondent released on his own recognizance, because "the Service admitted that the respondent's criminal conviction was not a 'particularly serious crime,'" and because of the respondent's extensive family ties to the United States (including his wife, who was granted asylum by the Service, and his two United States citizen children). On March 11, 1998, the Board granted the Service's motion for a stay of the Immigration Judge's order resulting from the bond redetermination, pending our adjudication of the Service's appeal from that order.

While the Service's appeal was pending, the applicable law changed. The period during which the TPCR were allowed to substitute for the detention provisions enacted as section 236(c) of the Act expired. According to the specific language of section 303(b)(2) of the IIRIRA, Congress provided that section 236(c) of the Act "shall apply to individuals released after [the expiration of the TPCR on October 9, 1998]." Section 236(c) of the Act provides that the Attorney General shall take into custody any alien who has committed

or been convicted of certain enumerated crimes "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."

It is undisputed that the respondent was released from criminal incarceration well before October 9, 1998. Owing to the passage of time, the TPCR have expired and our determination of the Service's appeal of the Immigration Judge's bond order is governed by section 236(c) of the Act. The questions before us are whether the terms of section 236(c) mandate that the respondent remain detained, and if not, under what standard he may be released from custody.

### A. Plain Language: "Released After" and "When the Alien Is Released"

A statute's legislative purpose is expressed by its plain language. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984); INS v. Phinpathya, 464 U.S. 183, 189 (1984); United States v. American Trucking Ass'ns, 310 U.S. 534, 543 (1940) (ruling that "[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes"). We too recognize that "it is assumed that the legislative purpose is expressed by the ordinary meaning of the words . . . [and that] [t]he language of the statute must ordinarily be regarded as conclusive . . . ." Matter of Noble, supra, at 677 (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987)); see also Matter of M/V Signeborg, 9 I&N Dec. 6, 7-8 (BIA 1960) (holding that "the language of the law cannot be enlarged beyond the ordinary meaning of its terms").

Notably, in Matter of Noble, supra, at 678, the Board ruled that "[o]ur reading [of the transition rule statute] comports with a 'plain meaning' statutory construction and is wholly consistent with congressional intent." See also id. at 694 (Rosenberg, concurring and dissenting) (agreeing that the language is plain, but challenging the majority's interpretation of the language in the TPCR and section 236(c) of the Act as not comporting with the plain meaning of the terms in the statute). Given that we unanimously determined the language of the TPCR to be plain in Noble, I cannot

23

now agree with the majority's assertion that the "last sentence of section 303(b)(2) . . . is [not] free from uncertainty." <u>Matter of Adeniji</u>, <u>supra</u>, at 9.

First, the provisions that we are addressing here are, in effect, effective date provisions. <u>See, e.g.</u>, <u>Rivera v. Demore</u>, No. C-99-3042 THE, 1999 WL 521177, at *5 (N.D. Cal. July 13, 1999) (citing <u>Landgraf v. USI Film Products</u>, 511 U.S. 244, 280 (1994)); <u>Grant v. Zemski</u>, 54 F. Supp.2d 437, 443 (E.D. Pa. 1999); <u>Velasquez v. Reno</u>, 37 F. Supp.2d 663, 670, 671 n.8 (D.N.J. 1999); <u>see also</u> <u>Matter of Noble</u>, <u>supra</u>, at 689-92, 694-95 (Rosenberg, concurring and dissenting); <u>Matter of Valdez</u>, 21 I&N Dec. 703, 720 (BIA 1997) (Rosenberg, dissenting) (noting that over 10 federal courts had found, contrary to the thesis advanced by the majority, that applying the amended rules to an alien previously released from incarceration not only offended constitutional considerations, but resulted in an impermissibly retroactive application of the TPCR). Section 303(b)(2) of the IIRIRA states that "[a]fter the end of such 1-year or 2-year periods [during which the TPCR are effective], the provisions of such section 236(c) shall apply to individuals <u>released after such periods</u>." (Emphasis added.) The operative words, "released after such period," clearly refer to the period <u>after the expiration of the TPCR</u>. The temporal limitations in the statute attached to the use of the word "released" make clear that the release contemplated by Congress to trigger mandatory custody under section 236(c) of the Act is prospective; it may only occur after October 8, 1998, the date on which the provisions of the TPCR expire.

Second, while the majority concedes that "the natural sense of the words" in section 303(b)(2) of the IIRIRA supports the construction proposed by the parties, the majority inexplicably persists in questioning the use of those words on the basis that "the term 'released' is not expressly tied to any other language [that would clarify whether Congress was referring to a release from criminal custody or from Service custody]." <u>Matter of Adeniji</u>, <u>supra</u>, at 9. To the contrary, the context in which this language appears supports the conclusion that the plain meaning of the words refers to release from criminal incarceration rather than release from Service custody. <u>See</u> <u>K Mart Corp. v. Cartier Inc.</u>, 486 U.S. 281, 291 (1988); <u>see also</u> <u>Rivera v. Demore</u>, <u>supra</u>, at *5; <u>Velasquez v. Reno</u>,

supra, at 670; <u>Pastor Camarena v. Smith</u>, 977 F. Supp. 1415, 1417 (W.D. Wash. 1997). In particular, Congress' use of the term "released" in section 236(c) further illuminates its use of the term "released" in section 303(b)(2) of the IIRIRA, the provision at issue here. See <u>Matter of Noble</u>, <u>supra</u>, at 695-97 (Rosenberg, concurring and dissenting).

The specific terms of section 236(c) of the Act expressly go on to broadly construe "when the alien is released" to encompass releases on "parole, supervised release, or probation, and without regard to . . . arrest or imprison[ment] again for the same offense." Section 236(c)(1) of the Act. These types of "release" involve restrictions that exclusively relate to individuals in the criminal justice system who have completed a period normally following actual criminal incarceration. See <u>Cuomo v. Barr</u>, 7 F.3d 17, 18 (2d Cir. 1993) (finding that although "the term 'release' is not defined except as to include 'parole,' 'supervised release,' and 'probation,' . . . [t]he term 'supervised release' . . . replaced the 'special parole' which was '"a period of supervision served upon completion of a prison term."' <u>Gozlon-Peretz v. United States</u>, 498 U.S. 395, 399 (1991) (quoting <u>Bifulco v. United States</u>, 447 U.S. 381, 388 (1980))" (citations omitted)). What Congress is indicating by using this limiting language is that a noncitizen is subject to detention by the Service once his period of incarceration ends and he is released from actual imprisonment, notwithstanding that he still may be satisfying the terms of a sentence imposed by a criminal court.

By contrast, nothing in the Act authorizes such parole, supervised release, probation, or subsequent arrest or imprisonment as a civil penalty related to charges of removability. Thus, the clause in section 236(c) of the Act referring to an alien who is "released" clarifies that Congress intended the term "released" to refer to release from criminal incarceration. It follows that in enacting the TPCR section in the IIRIRA, Congress intended that noncitizens released from criminal incarceration while the TPCR were in force would be taken into custody by the Service and detained subject to the terms of the TPCR, and that those who were released from criminal incarceration after the TPCR expired would be subject to being taken into custody by the Service according to the mandatory detention provisions set forth in section 236(c) of the Act.

  I find mind boggling the majority's unwillingness to accept the statutory references to an alien who is taken into custody by the Attorney General "when <u>released</u> [from criminal incarceration]" under section 236(c) of the Act, and an alien who is "<u>released</u> [from criminal incarceration custody] after" the end of the TPCR period, to whom section 236(c) then would become applicable, as referring to the same type of "release."  See <u>Matter of Adeniji</u>, <u>supra</u>, at 8 (emphasis added); <u>Matter of Noble</u>, <u>supra</u>, at 679-80.  We have every reason to presume that Congress intended the same term, "released," to be understood similarly in each provision, as "[i]t is axiomatic that 'identical words used in different parts of the same act are intended to have the same meaning.'"  <u>Sale v. Haitian Centers Council, Inc.</u>, 509 U.S. 155, 203 n.12 (1993) (quoting <u>Atlantic Cleaners & Dyers, Inc. v. United States</u>, 286 U.S. 427, 433 (1932)).

  In his dissenting opinion, Board Member Grant charges that the majority makes the one choice that he believes to be manifestly contrary to the clear intent of Congress, to require detention of criminal aliens such as the respondent.  Board Member Grant contends that even the majority views its decision as militating "against the clear design of the statute:  to constrain or even eliminate the capacity of aliens who have committed crimes to remain at liberty." <u>Matter of Adeniji</u>, <u>supra</u>, at 34 (Grant, dissenting).  He finds this position inexplicable because he concludes that "[h]ere, there is no reasonable ground to disagree that, from the enactment of the AEDPA forward, Congress intended that mandatory detention of criminal aliens be a new and fundamental directive in immigration policy." <u>Id.</u> at 35.

  However, we are neither legislators nor mind readers, but adjudicators.  The Board has emphasized that in the absence of "clearly expressed legislative intention, . . . <u>inferences</u> . . . are insufficient to override the literal language of the statute . . . . [W]e are not at liberty to rewrite the literal language . . . [and] any changes to the express language must be left to Congress." <u>Matter of Noble</u>, <u>supra</u>, at 685-86.  Nowhere in Board Member Grant's dissent does he attempt to account for the plain language that Congress used in the statute, or to rationalize his concerns as being consistent either with applicable principles of statutory construction or with the considerable federal court authority, discussed below, to the contrary.

With all due respect, Board Member Grant has it backwards: we discern congressional intent from the explicit language Congress uses in the statute. We do not imbue the statutory language with whatever meaning we feel certain that Congress intended. In discerning the intent of Congress, "[o]ur compass is not to read a statute to reach what we perceive—or even what we think a reasonable person should perceive—is a 'sensible result.'" Bifulco v. United States, 447 U.S. 381, 401, 402 (1980) (Burger, C.J., concurring) ("The temptation to exceed our limited judicial role . . . takes us on a slippery slope. Our duty . . . [is to] apply the law and hope that justice is done." (citing The Spirit of Liberty: Papers and addresses of Learned Hand 306-07 (Dilliard ed. 1960))).

Finally, employing a literal interpretation of section 303(b)(2) of the IIRIRA in concluding that section 236(a) controls the bond redeterminations of aliens who are not subject to section 236(c) of the Act does not yield absurd or anomalous results. See Chapman v. United States, 500 U.S. 453, 463 (1991) (ruling that "[a] straightforward reading of [the federal statute] does not produce a result 'so "absurd or glaringly unjust,"' United States v. Rodgers, 466 U.S. 475, 484 (1984)" (citation omitted)); see also Matter of Fuentes-Campos, 21 I&N Dec. 905 (BIA 1997). As discussed below, custody determinations made under such a standard may include consideration of dangerousness. Furthermore, as the Supreme Court concluded in Bifulco v. United States, supra, at 400-01:

> If our construction . . . clashes with present legislative
> expectations, there is a simple remedy—the insertion of a
> brief appropriate phrase, by amendment, into the present
> language . . . . But it is for Congress, and not this
> Court, to enact the words that will produce the result the
> Government seeks in this case.

## B. Federal Court Review of the Statute

Virtually every federal court that has addressed the issue has ruled that section 236(c) of the Act applies only to aliens "released" from criminal incarceration on October 9, 1998, and has found the statutory language to be plain, not "uncertain." Cf. Matter of Adeniji, supra, at 12. Similarly, each of these federal

courts has understood the "release" in question to be release from criminal incarceration.

In so ruling, each of these federal courts has considered the issue of whether section 236(c) of the Act applies to persons released from criminal incarceration prior to October 9, 1998, and has struck down the interpretation of the term "released" suggested by our decision in Matter of Noble, supra, and adopted by the Service under the current regulations. See, e.g., Miranda-Arteaga v. Reno, No. CV-99-0949 (M.D. Pa. July 1, 1999); Velasquez v. Reno, supra; Abdel-Fattah v. Reno, No. 99-CV-0947 (M.D. Pa. June 28, 1999); Grant v. Zemski, supra; Aquilar v. Lewis, 50 F. Supp.2d 539 (E.D. Va. 1999); Alvarado-Ochoa v. Reno, No. 99-0470-IEG (AJB) (S.D. Cal. May 28, 1999); Baltazar v. Fasano, No. 99-CV-380 BTM (S.D. Cal. Mar. 25, 1999); Reyes-Rodriguez v. Fasano, No. 99-CV-0023 (S.D. Cal. Feb. 26, 1999); Alves-Curras v. Fasano, No. 98-CV-2295 (S.D. Cal. Feb. 22, 1999); Alwaday v. Beebe, 43 F. Supp.2d 1130 (D. Ore. 1999).

These cases all hold that the plain language "released" in both section 236(c) of the Act and section 303(b)(2) of the IIRIRA makes clear that only aliens who are released from criminal incarceration on or after October 9, 1998, are subject to mandatory detention. Specifically, "IIRIRA § 303(b)(2) clearly sets forth the express command of Congress that the permanent mandatory detention provisions are to be applied to aliens who were released after the transitional rules expired." Velasquez v. Reno, supra, at 671 (emphasis added). As the district court in Miranda-Arteaga v. Reno, supra, the district wherein the respondent's case arises, stated succinctly,

> Section 236(c) states that "[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having committed [a deportable offense] . . . when the alien is released . . ." 8 U.S.C. § 1226(c). Congress further provided that section 236(c) "shall apply to individuals released after [the expiration of the transitional rules]." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 303(b)(2); Velasquez v. Reno, 37 F. Supp.2d. at 671-73; Alwaday v. Beebe, 1999 WL 184028 (D. Or., Jan. 29, 1999). IIRIRA § 303(b)(2) clearly sets forth the express command

28

of Congress that the permanent mandatory detention provisions are to be applied to aliens who were released <u>after</u> the transitional rules expired. <u>Velasquez</u>, 37 F. Supp.2d. 671 (emphasis in original). The mandatory detention rule of § 236(c) thus does not apply to aliens released before the expiration of the Transition Period Custody Rules on October 9, 1998. Two district courts in this Circuit have reached the same conclusion on factual circumstances very similar to the recent action. <u>Velasquez</u>, <u>supra</u>; <u>Grant</u>, <u>supra</u>. I find their reasoning compelling and for the sake of expedition, adopt their analysis.

<u>Id.</u> at 6.

These courts have universally rejected the majority's reading of the statutory language of the TPCR, which was set forth in <u>Matter of Noble</u>, <u>supra</u>, as a "deviation from the plain language of section 303(b)(3)(A)." <u>See</u> <u>Rivera v. Demore</u>, <u>supra</u>, at *5 (remarking on the Board's dismissal of the phrase "when the alien is released" as having no purpose other than serving as a modifier to alert the Attorney General when to take an alien into custody as "[t]his curious interpretation"). In addition, at least one court has rejected as "unconvincing" the Board's original interpretation of the term "released," which was based on its "disbelief that Congress meant to narrow the class of criminal aliens subject to mandatory detention." <u>Id.</u>

### C. Constitutional Considerations

Notably, no court that has addressed the propriety of a petitioner's detention on the merits under these rules as they were previously interpreted has upheld a determination that the mandatory detention of the petitioner without access to a hearing before an impartial adjudicator is warranted. In part, this is due to the fact that the significant liberty interests implicated in the context of the current detention provisions militate in favor of the most restrictive interpretation of the statute that is permissible. <u>See generally</u> <u>United States v. Himler</u>, 797 F.2d 156, 158 (3d Cir. 1986) (interpreting language narrowly where 1984 Bail Reform Act marked a "radical departure" from former federal bail policy).

The encroachment on the liberty interests of an alien deemed to be subject to mandatory detention raises questions of constitutional magnitude concerning the reach of the TPCR and section 236(c) of the Act.  See Cabreja-Rojas v. Reno, 999 F. Supp. 493, 496 (S.D.N.Y. 1998); St. John v. McElroy, 917 F. Supp. 243, 250 (S.D.N.Y. 1996) (finding the interest in freedom from confinement to be "of the highest constitutional import").  As I noted in my dissenting opinion in Matter of Valdez, supra, at 718 (Rosenberg, dissenting), the canons of statutory construction militate in favor of a restrictive interpretation of a statutory provision "if a broader meaning would generate constitutional doubts."  See also United States v. Witkovich, 353 U.S. 194, 199 (1957); Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445-46 (1988).

While the Board may not decide the constitutionality of a statute, we do have the duty to render our decisions in a manner that will avoid constitutional questions.  Matter of Cenatice, 16 I&N Dec. 162 (BIA 1977).  Certainly, it is beyond dispute that constructions that cast doubt on a statute's constitutionality should be avoided. Public Citizen v. Department of Justice, 491 U.S. 440, 465-66 (1989); cf. Matter of Joseph, Interim Decision 3387 (BIA 1999) (contending that the Justice Department's regulations took into account a detained alien's "constitutional and liberty interests"). Taken together, the statutory issues and the constitutional questions that follow close behind warrant rejecting the objections voiced by Board Member Grant and adhering to the result reached by the majority.

The overwhelming majority of district courts that have considered mandatory immigration detention statutes, prior to this most recent enactment, have found them unconstitutional.  See, e.g., Kellman v. District Director, United States INS, supra; Paxton v. United States INS, 745 F. Supp. 1261 (E.D. Mich. 1990), aff'd on other grounds, 954 F.2d 1253 (6th Cir. 1992); Agunobi v. Thornburgh, 745 F. Supp. 533 (N.D. Ill. 1990); Leader v. Blackman, 744 F. Supp 500 (S.D.N.Y. 1990).  In particular, such statutes were found to violate the constitutional guarantees of substantive and procedural due process, and the prohibition against excessive bail.  See, e.g., St. John v. McElroy, supra (finding mandatory detention of lawful permanent residents under former section 236(e) of the Act unconstitutional).

30

The principles upheld in these cases apply with equal force to the issue now before us.

## II. FACTORS WARRANTING CHANGE IN CONDITIONS OF DETENTION AND RELEASE ON IMMIGRATION BOND

Custody redetermination for aliens released from criminal incarceration prior to the expiration date of the TPCR (after which time section 236(c) of the Act governs), still are subject to discretionary standards. Looking to section 303(b)(3)(B) of the IIRIRA, a criminal alien who was eligible for release under the TPCR had to demonstrate that he would not pose a danger to the safety of others if released and that he would be likely to appear in court. Furthermore, he either had to have been lawfully admitted to the United States or, if not, his country of removal had to be unwilling to accept him. Therefore, nonviolent criminal aliens could obtain a bond, whereas dangerous criminals could be held in detention.

As I read the majority opinion, the Board now requires a respondent who has been convicted of a criminal offense or other prohibited activity contrary to national security interests, but who is not subject to mandatory detention, to establish that he or she does not pose a danger to persons or property and is not likely to abscond. These factors are those that controlled under section 303(b)(3)(B)(i) of the IIRIRA. Similarly, former section 242(a)(2)(B) of the Act, 8 U.S.C. § 1252(a)(2)(B) (1994), provided that the Attorney General may not release an alien convicted of an aggravated felony unless the alien demonstrates that he or she has been lawfully admitted to the United States, does not present a threat to the <u>community</u>, and is likely to appear for any scheduled hearing. <u>See</u> <u>Matter of Ellis</u>, 20 I&N Dec. 641, 643 (BIA 1993).

Thus, I find a fairly clear declaration by the majority that the standard to be imposed is the one articulated under the TPCR and our precedents interpreting the immediately preceding versions of the detention statute authorizing immigration detention in which the respondent bears the burden of proof. <u>Matter of Ellis</u>, <u>supra</u>. That said, however, I do not find it necessary to conclude that 8 C.F.R. § 236.1(c)(8) (1999) controls our adjudication of the terms of the respondent's bond under section 236(a) of the Act. <u>Cf.</u> <u>Matter of</u>

31

<u>Drysdale</u>, 20 I&N Dec. 815 (BIA 1994). Nor do I agree that section 236(a) of the Act or 8 C.F.R. § 236.1(c)(8) creates a presumption of dangerousness.

Moreover, I cannot agree with the spectre raised by Board Member Grant that "that class of aliens 'released' during the Transition Period defined in section 303(b)(2) of the IIRIRA (and, perhaps, for that class released <u>before</u> the Transition Period, the class at issue in <u>Noble</u>), . . . can have their custody status determined under the most <u>minimal</u> standard now existing in the statute." <u>Matter of Adeniji</u>, <u>supra</u>, at 34 (Grant, dissenting). There is nothing in the majority opinion that relieves a convicted alien who has been released from criminal incarceration before the effective date of section 236(c) (occurring upon the expiration of the TPCR) from demonstrating that he or she is not a danger to persons or property and will not abscond.

Specifically, as I documented in <u>Matter of Noble</u>, <u>supra</u>, we have been perfectly capable of ordering criminal aliens who pose a threat to our communities to be held in or returned to Service detention, or to be released only under a significant bond. For example, in <u>Matter of Shaw</u>, 15 I&N Dec. 794 (BIA 1976), decided 20 years ago, we cited the complete lack of information regarding community ties, coupled with an undocumented entry and pending criminal possession of firearms charges, as warranting dismissal of an appeal of a $10,000 bond. In <u>Matter of Andrade</u>, <u>supra</u>, decided in 1987, we recognized that despite a record of long residence and family ties for much of the 12-year period prior to his arrest by the Service, the respondent had been involved in criminal activity involving attempted robbery and other theft of property, and we imposed a $10,000 bond. More recently, in <u>Matter of Kalifah</u>, 21 I&N Dec. 107 (BIA 1995), where no conviction or incarceration of any sort was involved, we readily invoked the flight risk factor under section 242(a)(1) of the Act to agree with the Immigration Judge in concluding that an alien, who was charged with a serious crime involving terrorism abroad, was best held without any bond at all.

I also disagree with the position taken by the majority that we may not consider portions of the record made before the Immigration Judge in a hearing on the merits that already has been resolved in

32

the respondent's favor, for purposes of resolving bond issues in the case of an alien whom the Service continues to hold in detention.

The language of the regulation, which instructs that bond redetermination hearings shall be held separate and apart from the removal hearing, makes it plain that evidence considered by an Immigration Judge during a removal hearing may be considered in redetermining bond, notwithstanding the rule that evidence presented at a bond hearing cannot be used to establish removability. The regulation at 8 C.F.R. § 3.19(d) provides as follows:

> Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding. The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service.

It is clear from this language that evidence presented in a removal hearing may be considered for purposes of bond redetermination. The underlying purpose of the regulation is not to limit the information an Immigration Judge may consider in redetermining bond, but to ensure that evidence presented in the far more informal bond hearing does not taint the ultimate adjudication of the charges of removability, in which the Service often carries the burden of proof. Matter of Chirinos, 16 I&N Dec. 276 (BIA 1977) (holding that absent a showing of prejudice to the alien, a bond decision resulting from a joint bond redetermination and deportation hearing will not be reversed).

Certainly, what transpires and is decided during a removal hearing may have a major impact on the alien's eligibility for bond. See, e.g., Matter of Joseph, Interim Decision 3398 (BIA 1999); Matter of Joseph, Interim Decision 3387. In the instant case, consideration of the Immigration Judge's determination in the removal hearing is to the respondent's advantage, and there would be no prejudice to the respondent if the Board were to review the removal and bond records simultaneously in the course of considering the instant appeal. Although the Board ordinarily does not consider evidence

33

offered on appeal, <u>see</u> <u>Matter of Soriano</u>, 19 I&N Dec. 764 (BIA 1988); <u>Matter of Obaigbena</u>, 19 I&N Dec. 533 (BIA 1988), the Board has issued its decisions after taking administrative notice of facts upon appeal. <u>Matter of H-M-</u>, 20 I&N Dec. 683 (BIA 1993) (affirming the Board's authority to take administrative notice).

Furthermore, based on the record now before us, we know that after a hearing on the respondent's application for withholding of removal, the Immigration Judge granted that application and thereafter redetermined that the respondent should be released on his own recognizance. Even if we do not look to the record of the merits hearing or consider the Immigration Judge's decision granting the respondent withholding of removal, as the respondent requests, the undisputed fact that the Immigration Judge granted withholding establishes that the Immigration Judge did not find the respondent to be convicted of a "particularly serious crime."

Consequently, I would grant relief on the same basis that the Immigration Judge ordered the respondent's release on his own recognizance. Unlike Chairman Schmidt, I see no basis in the majority opinion that warrants altering the bond order originally entered by the Immigration Judge and no reason to alter the decision of the Immigration Judge other than to render an order in conformity with the statute as it currently exists. Therefore, I favor an order finding the respondent eligible for release and setting his bond at the minimum required by statute.

<u>DISSENTING OPINION</u>: Paul W. Schmidt, Chairman; in which Fred W. Vacca, Gustavo D. Villageliu, and John Guendelsberger, Board Members, joined

I respectfully dissent. We should decide this case and release the respondent on bond.

I agree with the majority that the respondent is not subject to mandatory detention. I also agree that, to be released, the respondent must show that he will appear when required to do so and will not present a danger to persons or property.

Applying that standard to the respondent's situation, I agree with the Immigration Judge that the respondent should be released. Unlike the Immigration Judge, however, I would impose a bond of $3,000.

I disagree with the majority's decision to remand for four reasons. First, the Immigration Judge applied the proper legal standard. In concluding that release was warranted, he properly evaluated the following relevant factors.

He pointed out that the respondent had been granted withholding of removal, thus giving him a reasonable expectation of success on the merits and reducing the incentive to abscond. He noted the absence of any suggestion in the record that the respondent is, or ever has been, a physical danger to persons. He also noted that the particular aggravated felony of which the respondent was convicted, bank fraud, does not qualify as a "particularly serious crime" for withholding of removal purposes. That determination necessarily includes a balancing of various factors relating to the level of danger to society, including the danger to property. See, e.g., Matter of S-S-, Interim Decision 3374 (BIA 1999). He further noted that the Immigration and Naturalization Service, the party with every incentive to do so, had not asserted that the respondent's crime was "particularly serious."

Second, the uncontested information available to us on appeal supports the Immigration Judge's decision to release. The respondent is married to an individual who has herself been granted asylum in the United States, and he is the father of two United States citizen children. These significant ties to the United States give the respondent additional reasons to comply with the terms of release and to refrain from fraudulent or criminal conduct while his immigration case is pending.

Third, at this point, the duration of the respondent's release on our order will be so brief that fraudulent harm to property is highly unlikely before his case is resolved. We have the merits of the respondent's withholding of removal case before us. Assuming that we act promptly, one of two things will occur shortly. If we dismiss the Service's appeal, the respondent will be granted the relief of withholding of removal and his ultimate, long-term release

from custody is highly likely.  If we sustain the Service's appeal, the respondent's circumstances will thereby change and his custody status could be reexamined by the appropriate authorities at that time.

Fourth, and finally, a remand is pointless.  The Immigration Judge has already ordered the respondent released under the standard we are adopting and, as recently as July 26, 1999, he declined to alter that decision.  We can reasonably anticipate that the same result will occur on remand.  Assuming that the Immigration Judge once again orders release, the Service undoubtedly will appeal and the case will be returned to us.  We should resolve it now, rather than later.

This remand is wrong.  This appeal has been pending before us for more than a year, and it should be decided now.  I would affirm the Immigration Judge's decision to release the respondent. However, in light of some of the concerns expressed by the majority, I would impose a bond in the amount of $3,000.

Therefore, I respectfully dissent from the decision to remand this case.

DISSENTING OPINION: Edward R. Grant, Board Member, in which Anthony C. Moscato, Board Member, joined

I respectfully dissent.

The majority opinion capably presents the options that face this Board in determining what standard ought to be applied in deciding whether the respondent shall be subject to custody by the Immigration and Naturalization Service or released on bond.  These options are to apply:

(1) the permanent detention provisions of section 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c) (Supp. II 1996), as enacted by section 303(a) of the Illegal Immigration Reform and Immigrant Responsibility Act

of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-585 ("IIRIRA");

(2) the Transition Period Custody Rules, as enacted by section 303(b)(3) of the IIRIRA, 110 Stat. at 3009-586; or

(3) the general "arrest, detention, and release" provisions of section 236(a) of the Act, also enacted by section 303(a) of the IIRIRA.

The majority has selected the third option, which allows the release on bond of an alien pending deportation proceedings, but with no specific mandate to detain if the alien is a criminal. In so doing, the majority makes the one choice that is manifestly contrary to the clear intent of Congress, expressed in the major immigration legislation of 1996, to require detention of criminal aliens such as the respondent.

Prior to 1996, subparagraph (A) of former section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994), mandated the detention only of an alien convicted of an aggravated felony, and subparagraph (B) prohibited release of such an alien unless the alien demonstrated that he or she was not a threat to the community and was likely to appear at future hearings.

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), significantly expanded the scope of the requirement to detain criminal aliens, while at the same time limiting the ability of this larger category of criminal aliens to be released. First, section 440(c) of the AEDPA, 110 Stat. at 1277, amended section 242(a)(2) of the Act to mandate detention of aliens convicted under a wide range of offenses listed as grounds for deportation under former section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1994). Second, section 435 of the AEDPA, 110 Stat. at 1274-75, expanded the deportation grounds under section 241(a)(2)(A)(i)(II) of the Act (crimes involving moral turpitude), and section 440(e) of the AEDPA, 110 Stat. at 1277, expanded the definition of aggravated felony, both having the effect of increasing the numbers of criminal aliens subject to mandatory detention. Finally, Congress repealed subparagraph (B) of section

242(a)(2) of the Act, thus terminating the ability of aliens under the detention mandate to obtain release.

Congress did not significantly retreat from this position in the IIRIRA. In fact, by extending the definitional and temporal scope of the term "aggravated felony," Congress further expanded the ranks of criminal aliens who would be subject to mandatory detention. Congress did, however, temporarily ameliorate the "no-release" policy of the AEDPA by enacting the Transition Period Custody Rules ("TPCR"). As the Board recognized in Matter of Noble, 21 I&N Dec. 672, 675 (BIA 1997), Congress included the TPCR in the IIRIRA to allow time for this new detention mandate to be fully implemented. The impact of our ruling today is the opposite: for that class of aliens "released" during the Transition Period defined in section 303(b)(2) of the IIRIRA (and, perhaps, for that class released before the Transition Period, the class at issue in Noble), the end of the Transition Period means that they can have their custody status determined under the most minimal standard now existing in the statute—even if, as the majority concedes, they would have been ineligible for release under the TPCR. Rather than leading to full implementation of the detention mandate, the Board's interpretation allows criminal aliens released during the Transition Period to revert back, after its expiration, to a more favorable position, and to avoid any scheme of mandatory detention, even the modified one in place under the TPCR.

At the core of the majority's evident conundrum in resolving the standard under which bond and custody matters will be decided for those released during the TPCR are two provisions, one present in the IIRIRA as enacted and the other one absent from it. The first is the last sentence of section 303(b)(2) of the IIRIRA, which states that the mandatory detention scheme set forth at section 236(c) of the Act will apply only to those released after the end of the TPCR. The second, and absent, provision is a "savings" clause for the TPCR. In considering these factors, the majority reasons that, because Congress included no savings clause for the TPCR (thus causing its complete termination on October 8, 1999), and because those released during the TPCR cannot be subject to mandatory detention owing to the last sentence of section 303(b)(2), the only standard available for consideration of bond/custody matters relating to criminal aliens released during the TPCR is section

236(a), the general provision of the Act governing such matters for all aliens in proceedings, criminal and noncriminal alike.

Thus, the majority concludes that the presence of the last sentence of section 303(b)(2), coupled with the absence of a saving clause, compels a result that even it admits militates against the clear design of the statute:  to constrain or even eliminate the capacity of aliens who have committed crimes to remain at liberty.  It is true that the TPCR contain no explicit savings clause.  Congress did not include one, in all likelihood, because it expected that upon the termination of the TPCR, the mandatory detention scheme of section 236(c) would come into effect.  The last sentence of section 303(b)(2), which appears to preclude the application of the mandatory detention scheme to those released <u>during</u> the TPCR, is sufficient to serve as an implicit savings clause for those who had already been subject to the TPCR.  It states that only those released <u>after such periods</u> would be subject to detention under section 236(c).  The words "such periods" refer to the 1- or 2-year TPCR periods provided in the statute.  The clear inference to be drawn from that sentence is that those released during the TPCR would remain subject to the terms of the rules during the pendency of their proceedings.

Had Congress intended this group to be adjudicated under section 236(a), it would presumably have said so, given the profound shift from a policy of mandatory detention that this would have entailed. In the absence of such clear direction, our only reasonable choice is to infer from both the overall purpose of the statute and the words of section 303(b)(2) that Congress intended this class of aliens to have their bond and custody status determined under the TPCR, and not under the standard bond/custody provision available to noncriminal aliens in proceedings.

Our ruling today could have far-reaching impact.  Potentially, thousands of criminal aliens who were released from federal or state custody before or during the Transition Period could see their prospects for release from Service custody improve.  As can be seen in the split decision issued here, it is uncertain to what extent the application of 8 C.F.R. § 236.1(c)(8) (1999) will result in release of such aliens.  However, it is likely that one of the key purposes of Congress in mandating detention—that criminal aliens do

not abscond and actually are removed from the United States if they are found deportable—will be undermined.  As Congress noted in enacting the AEDPA and the IIRIRA, the standard of "low flight risk" incorporated in immigration bond determinations has proved to be a weak assurance that aliens will actually show up for their hearings.

  Our responsibility to interpret ambiguous statutory terms does not arise in a vacuum.  The plenary authority to regulate immigration vested in the Congress by the Constitution has been delegated for purposes of implementation to the Attorney General, who has in turn delegated the adjudicatory portion of that authority to us and to the Immigration Judges.  Thus, our responsibility to give precise meaning to legislative terms must always be at the service of implementing the will and intent of Congress.  Here, there is no reasonable ground to disagree that, from the enactment of the AEDPA forward, Congress intended that mandatory detention of criminal aliens be a new and fundamental directive in immigration policy. The majority appears to acknowledge that clear intent, yet, for reasons that I find inexplicable, refuses to implement it.

  I fear that this exercise of statutory deconstruction will ill-serve the Board and frustrate the very purposes for which the parties have advanced it.  The mandatory detention provisions of the AEDPA and the IIRIRA are controversial and have imposed burdens on criminal aliens and their families, as well as on the resources of the Service.  We must assume, however, that these are burdens that Congress felt ought to be imposed because of the risks inherent in previous, more generous policies of release.  It is for Congress, not the Service, and not the Board, to alleviate those burdens.  The risk of today's decision is that Congress's first priority in revisiting the issue of criminal alien detention may be to address the "gap" that we have needlessly created in our decision today.