19-2284-cv
*Velasco Lopez v. Decker*

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2019

No. 19-2284-cv

CARLOS VELASCO LOPEZ,

*Petitioner-Appellee,*

v.

THOMAS DECKER, IN HIS OFFICIAL CAPACITY AS NEW YORK FIELD OFFICE DIRECTOR FOR THE U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CHAD F. WOLF, IN HIS OFFICIAL CAPACITY AS ACTING SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY, JAMES MCHENRY, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, WILLIAM P. BARR, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES,

*Respondents-Appellants.*

_____

Appeal from the United States District Court
for the Southern District of New York
No. 19 Civ. 2912 (ALC), Andrew L. Carter, Jr., District Judge, Presiding.
(Argued May 13, 2020; Decided October 27, 2020)

B e f o r e:

PARKER, CHIN, AND CARNEY, *Circuit Judges*

The Government appeals from a judgment of the United States District Court for the Southern District of New York (Carter, *J.*), granting Carlos Alejandro Velasco Lopez's petition for a writ of habeas corpus. Velasco Lopez was detained pursuant to 8 U.S.C. § 1226(a), which provides for discretionary detention of noncitizens during the pendency of removal proceedings. His habeas petition challenged the procedures employed in his bond hearings, which required him to prove, to the satisfaction of an immigration judge, that he is neither a danger to the community nor a flight risk. We hold that the district court correctly granted the petition, and provided the correct remedy by ordering a new bond hearing in which the Government bore the burden of showing by clear and convincing evidence that Velasco Lopez was either a danger or a flight risk.

AFFIRMED

_____

JULIE DONA, Supervising Attorney (Janet E. Sabel, Attorney-in-Chief, Adriene Holder, Attorney-in-Charge, Civil Practice, Hasan Shafiqullah, Attorney-in Charge, Immigration Law Unit, Aadhithi Padmanabhan, Of Counsel, *on the brief*), The Legal Aid Society, New York, NY, *for Petitioner-Appellee*

CHRISTOPHER CONNOLLY, Assistant United States Attorney (Benjamin H. Torrance, *on the brief*), *for* Audrey Strauss, Acting United States Attorney, Southern District of New York, *for Respondents-Appellants*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

The Government[1] appeals from a judgment of the United States District Court for the Southern District of New York (Carter, *J.*), granting Carlos Alejandro Velasco Lopez's petition for a writ of habeas corpus. Velasco Lopez was detained pursuant to 8 U.S.C. § 1226(a), which provides for discretionary detention of noncitizens during the pendency of removal proceedings.[2] At various bond hearings, Velasco Lopez was unable to carry the burden, placed on him by immigration regulations, to prove that he was neither a danger to the community nor a flight risk. *See Matter of Guerra*, 24 I. & N. Dec. 37, 38 (B.I.A. 2006); *Matter of Adeniji*, 22 I. & N. Dec. 1102, 1112 (B.I.A. 1999).[3] He was twice denied bail and remained incarcerated in Orange County Correctional Facility

---

[1] Appellants are Thomas Decker, New York Field Office Director for the U.S. Immigration and Customs Enforcement ("ICE"), Chad F. Wolf, Acting Secretary of the U.S. Department of Homeland Security ("DHS"), James McHenry, Director of the Executive Office for Immigration Review ("EOIR"), and William P. Barr, U.S. Attorney General.

[2] 8 U.S.C. § 1226(a) provides that "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General may continue to detain the arrested alien; and may release the alien on bond of at least $1,500 . . . or conditional parole."

[3] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

for fourteen months before he filed a habeas petition challenging the procedures employed in his bond hearings.

The district court granted Velasco Lopez's petition and ordered a new bond hearing at which the Government was required to show by clear and convincing evidence that he was either a flight risk or a danger to the community. When the Government failed to do so, the immigration judge granted Velasco Lopez release on the condition that he post a $10,000 bond. He did so and was admitted to bail.

The Government appeals from this decision, arguing that the procedures employed in Velasco Lopez's various bond hearings were constitutionally adequate and that the district court erred in ordering a new hearing with the shifted burden of proof. We disagree. We conclude that Velasco Lopez was denied due process because he was incarcerated for fifteen months (with no end in sight) while the Government at no point justified his incarceration. We further conclude that the district court correctly ordered a new bond hearing where the Government bore the burden of proof. We therefore affirm the judgment of the district court.

**BACKGROUND**

Velasco Lopez was born in Oaxaca, Mexico, in 1995. He arrived in the United States at the age of four and has not left the country since his arrival. Since 2000, Velasco Lopez and his family have been living in Westchester County, New York.[4] He attended kindergarten through high school in New York. He was a member of the youth group at his family's church, frequently placed on the honor roll, and received awards for perfect attendance at his school. In addition, he participated in numerous extracurricular activities, including band, track, and soccer. Since graduating high school, he has been a caretaker to his mother, who suffers from a number of health conditions. In 2012, during his last year of high school, Velasco Lopez submitted an application under the Deferred Action for Childhood Arrivals ("DACA") program; his application was approved in 2013. After completing courses at a culinary institute following high school, he began working as a sous chef for a local catering company. In his unsuccessful bail applications, he submitted numerous

---

[4] The Government in its brief describes Velasco Lopez's life in the United States in a single sentence: "Carlos Velasco Lopez is a native and citizen of Mexico who entered the United States unlawfully at an unknown time and place, and later was charged with several criminal offenses." Appellants' Br. 1; *see also id*. at 12. Yet, the Government had in its files ready access to information about Velasco Lopez's family and community ties in his initial Deferred Action for Childhood Arrivals ("DACA") application.

letters from his managers and coworkers attesting to his character and work ethic. He maintained his DACA status until November 2017, when his renewal application was denied.

In October 2016, Velasco Lopez pled guilty to driving while ability impaired ("DWAI").[5] On February 1, 2018, he was arrested and issued appearance tickets for aggravated unlicensed operation of a vehicle, driving while intoxicated, and consumption of alcohol in a motor vehicle. He has not been convicted of any of these charges. At the time of his February 2018 arrest, Velasco Lopez was also subject to charges related to an incident in March 2017 at a bar in White Plains, New York, where a fight broke out between an off-duty police officer and other bar patrons. Velasco Lopez consistently denied any involvement in the altercation and the charges were eventually dismissed in June 2018.

The day after his February 1, 2018 arrest, Velasco Lopez was transferred to ICE custody. He was incarcerated for three and half months before he received an initial bond hearing on May 14, 2018. At the time of the May 2018 hearing, the

---

[5] Velasco Lopez is seeking to vacate this plea on the ground that his attorney did not inquire into his residency status and he was not informed that the plea would jeopardize his DACA status.

6

charges stemming from the White Plains bar incident were still pending, as were the charges from the February 2018 arrest. In accordance with BIA precedent, the immigration judge placed the burden on Velasco Lopez to justify his release, and, when he could not do so, in part due to the outstanding charges, the immigration judge denied his bail application on June 21, 2018.

Before his initial bond hearing, on four separate occasions between February 2018 and April 2018, ICE declined to produce Velasco Lopez for criminal court appearances related to the charges stemming from the White Plains incident. When ICE finally produced him in White Plains City Court on June 25, 2018, the charges were dismissed. While incarcerated, Velasco Lopez faced similar obstacles in attempting to resolve the charges stemming from his February 2018 arrest. After he failed to appear for his initial criminal court date—due to his incarceration in ICE custody—a bench warrant was issued for his arrest on February 2018.

On August 7, 2018, Velasco Lopez, represented by counsel from the Legal Aid Society, submitted a renewed bond request citing 'changed circumstances' based on the dismissal of the charges stemming from the White Plains bar incident. *See* 8 C.F.R. § 1003.19(e). He was given a second hearing on October 10,

2018. In this bond hearing, as in his initial hearing, agency procedures dictated that Velasco Lopez bore the burden of showing to the satisfaction of the immigration judge that he was neither a flight risk nor dangerous. Under agency policy, ambiguities, or lack of information, in the record result in an adverse inference against the detainee. In the second bond hearing, for example, the immigration judge required that Velasco Lopez submit the charging documents from his February 2018 arrest. But that case had not progressed as a result of Velasco Lopez's incarceration, and he had not yet been able to answer the charges. When his counsel submitted the charging document, the immigration judge was unsatisfied with its level of detail, noting that it did not include Velasco Lopez's blood alcohol level or even the reason why the officer stopped his car. The immigration judge concluded that he did not have all the relevant facts before him and thus made adverse inferences against Velasco Lopez and again denied bail.

In April 2019, having been incarcerated for fourteen months and denied bail twice, Velasco Lopez filed a petition for a writ of habeas corpus challenging on due process grounds the procedures employed in his hearings. The district court granted his petition and ordered a new hearing at which the Government,

8

not Velasco Lopez, was required to justify his continued incarceration by presenting clear and convincing evidence that he was either a flight risk or a danger to the community. A new hearing was held at which the Government focused its substantial expertise and resources on Velasco Lopez's circumstances. After hearing from the Government, the immigration judge concluded that it had failed to establish that Velasco Lopez was either a flight risk or dangerous, and ordered him released on a $10,000 bond, which he posted. He has remained with his family pending the outcome of his ongoing removal proceedings.

We review de novo a district court's grant of habeas relief under 28 U.S.C. § 2241. *Guerra v. Shanahan*, 831 F.3d 59, 61 (2d Cir. 2016).

## DISCUSSION

### I.

Detention during removal proceedings is a constitutionally valid aspect of the deportation process. *Demore v. Kim*, 538 U.S. 510, 523 (2003). The constitutionality of detention pending removability proceedings under § 1226(a) is not at issue in this case. Our concern is, in the words of the Supreme Court, with the "important constitutional limitations" on that power's exercise. *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001).

9

The Immigration and Nationality Act ("INA") has provided for discretionary detention pending removal proceedings since it was enacted in 1952. The statute providing for that detention is currently codified as 8 U.S.C. § 1226(a). Until the early 1990s, the Attorney General exercised his discretion with a presumption in favor of liberty during the pendency of removal proceedings. This presumption was repeatedly affirmed by the Board of Immigration Appeals ("BIA"). *See Matter of Patel*, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) ("An alien generally is not and should not be detained or required to post bond except on a finding that he is a threat to national security or that he is a poor bail risk."); *see also Matter of Andrade*, 19 I. & N. Dec. 488, 489 (B.I.A. 1987).

In 1996, Congress, concerned with, among other things, the number of aliens in removal proceedings who did not appear for their hearings, amended the INA by passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996). IIRIRA expanded a carve-out in the INA that mandated detention during removal proceedings for "criminal aliens" with certain triggering convictions. That provision, now located at 8 U.S.C. § 1226(c), provides for mandatory detention of a small class of noncitizens, who are

inadmissible or deportable for having committed certain serious crimes such as murder or robbery, or having engaged in terrorist activities, based on a congressional finding that they pose a heightened bail risk as a class. *See Demore*, 538 U.S. at 518–521. It authorizes release of noncitizens in this class only for witness-protection purposes if the noncitizen "satisfies the Attorney General that [he] will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2). At the same time, Congress left untouched the general detention provision at issue here, 8 U.S.C. § 1226(a), aside from increasing the minimum bond amount from $500 to $1500.

Following the enactment of IIRIRA, the Immigration and Naturalization Service ("INS"), not Congress, implemented new regulations that altered the standard for the initial post-arrest custody determination made by INS officials. 8 C.F.R. § 236.1(c)(2)-(8). The new regulations established a presumption of detention and placed on the arrested individual the burden of demonstrating, to the satisfaction of the arresting officer, that release would not pose a danger to property or persons and that the individual is likely to appear for any future proceedings. *See* 8 C.F.R. § 236.1(c)(8). The regulation applies only to the initial

custody determination made by the arresting officer and not to immigration judges in bond hearings. However, shortly after the new regulations were implemented, the BIA began applying the rule provided in § 236.1(c)(8) for arresting officers, including the presumption of detention, to bond hearings conducted by immigration judges under § 1226(a). *Matter of Adeniji*, 22 I. & N. Dec. at 1112; *Matter of Guerra*, 2I I. & N. Dec. at 38.

By definition, individuals detained under § 1226(a) have not received a final decision as to whether they are to be removed.[6] 8 U.S.C. § 1226(a). Under the regime fashioned by the INS and BIA, a noncitizen detained under § 1226(a) is subject to detention unless that person is able to show "to the satisfaction of the Immigration Judge that he or she merits release on bond." *Matter of Guerra*, 24 I. & N. Dec. at 40; *see Matter of Fatahi*, 26 I. & N. Dec. 791, 795 n.3 (B.I.A. 2016). The BIA itself acknowledges that § 1226(a) contains no such requirement. *See Matter of Adeniji*, 22 I. & N. Dec. at 1113 ("[T]he alien must demonstrate that 'release

---

[6] This includes individuals who have not yet been determined removable, i.e., they are not subject to a final order of removal, in addition to those held pending an appeal—even if the individual has prevailed below and the appeal is brought by the Government. *See* 8 U.S.C. § 1231(a)(1)(B)(ii); *see also Hechavarria v. Sessions*, 891 F.3d 49, 56 (2d Cir. 2018). In this Circuit, § 1226(a) also applies to individuals who are subject to a reinstated order of removal during the pendency of withholding-only proceedings. *Guerra*, 831 F.3d at 64.

would not pose a danger to property or persons,' even though section [1226(a)] does not explicitly contain such a requirement."). Individuals subject to this requirement include lawful permanent residents, individuals with lawful status, and individuals lacking full legal status but with deferred enforcement protections. As previously noted, "criminal aliens" are treated elsewhere in the statute and that provision does not apply to Velasco Lopez.

As a result of the BIA's extension of the standard under 8 C.F.R. § 236.1(c)(8) to 8 U.S.C. § 1226(a) bond hearings conducted by immigration judges, the Government does not need to show at any point that a noncitizen is a danger to the community or a flight risk. *Contra Matter of Patel*, 15 I. & N. Dec. at 666; *Matter of Au*, 13 I. & N. Dec. 133, 137-38 (B.I.A. 1968). Instead, incarceration occurs when bond is denied absent a showing by the detainee that she is not dangerous or a flight risk. *See, e.g.*, *Matter of Siniauskas*, 27 I. & N. Dec. 207, 210 (B.I.A. 2018). Consequently, under the current BIA precedent, the Government need not show anything to justify incarceration for the pendency of removal proceedings, no matter the length of those proceedings.

Under § 1226(a), Congress has delegated to the Attorney General the discretion to detain noncitizens during the pendency of their removal

proceedings. "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e).

The Supreme Court has made clear that § 1226(e) does not preclude challenges to "the extent of the Government's detention authority under the statutory framework as a whole." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018). Nor does it "limit habeas jurisdiction over constitutional claims or questions of law." *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011); *see also Demore*, 538 U.S. at 517 ("Section 1226(e) contains no explicit provision barring habeas review."). "[C]laims that the discretionary process itself was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." *Singh*, 638 F.3d at 1202. Here, Velasco Lopez raises a due process challenge not to his initial detention but to the procedures that resulted in his prolonged incarceration without a determination that he poses a heightened bail risk. Whether Velasco Lopez received the due process to which

14

he was entitled "is not a matter of discretion" and is subject to judicial review. *Zadvydas*, 533 U.S. at 688.

## II.

No one disputes that the Fifth Amendment entitles noncitizens to due process of law. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Demore*, 538 U.S. at 523. The Fifth Amendment entitles all "persons" to due process of law. U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."). Accordingly, the Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent. *Zadvydas*, 533 U.S. at 693.

Noncitizens are also entitled to challenge through habeas corpus the legality of their ongoing detention. *Boumediene v. Bush*, 553 U.S. 723, 771, (2008). Habeas review is not limited to evaluating the lawfulness of detention when it is first imposed (something that is not challenged here) but is also available to challenge whether, at some point, an ongoing detention has become unlawful. *See Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted [28 U.S.C.] § 2241 as applying to challenges to . . . such matters as the administration of parole, prison disciplinary actions, prison transfers, type of

15

detention and prison conditions."). The "necessary scope" of this review and resulting relief "in part depends upon the [procedural] rigor of any earlier proceedings." *Boumediene*, 553 U.S. at 781. The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review. *Id.* at 781–83, 786; *see also I.N.S. v. St. Cyr*, 533 U.S. 289, 301–02 (2001).

These requirements take on particular significance when we consider what actually happened to Velasco Lopez. He was not "detained"; he was, in fact, incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes. But in sharp contrast to them, the "sum total of procedural protections afforded to" Velasco Lopez was far less.[7] *Boumediene*, 553 U.S. at 783. Velasco Lopez had no right to court-appointed counsel and no regular right to judicial review of his incarceration. He had no rights analogous to Sixth Amendment speedy trial rights. He faced significantly greater obstacles to

---

[7] This anomaly is highlighted in *Demore* where the Supreme Court, in upholding the constitutionality of § 1226(c), focused on the heightened risk posed by a narrow class of noncitizens with specific types of "prior convictions, which were obtained following the *full procedural protections* our criminal justice system offers." *Demore*, 538 U.S at 513 (emphasis added).

16

acquiring evidence than an indicted or convicted criminal defendant. In addition, because the BIA placed on Velasco Lopez the burden of justifying his release, there was a considerable risk of error in the BIA's findings. And that risk was not theoretical: costly error actually occurred.

It is in this context that we evaluate the issue that is dispositive on this appeal: whether Velasco Lopez's ongoing incarceration posed due process concerns at the time of his habeas filing and whether additional procedural protections then became necessary. We do so under the three-factor balancing test as provided in *Mathews v. Eldridge*, 424 U.S. 319 (1976). The three *Mathews* factors are: (1)"the private interest that will be affected by the official action"; (2)"the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3)"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action." *Id.* at 348.

A.

17

Here, the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). Case after case instructs us that in this country liberty is the norm and detention "is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "We have always been careful not to minimize the importance and fundamental nature of the individual's right to liberty." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also Hamdi*, 542 U.S. at 529–30. In the same vein, "[i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States*, 463 U.S. 354, 361 (1983).

The deprivation that Velasco Lopez experienced was not the result of a criminal adjudication. *Compare* 8 U.S.C. § 1226(a) *with id.* § 1226(c). Nevertheless, he spent nearly fifteen months incarcerated in the Orange County Correctional Facility where he was held alongside criminally charged defendants and those serving criminal sentences. *See, e.g.*, *Charles v. Orange Cnty.*, 925 F.3d 73, 78 n.3 (2d Cir. 2019). The deprivation he experienced while incarcerated was, on any calculus, substantial. He was locked up in jail. He could not maintain employment or see his family or friends or others outside normal visiting hours.

The use of a cell phone was prohibited, and he had no access to the internet or email and limited access to the telephone.

There is no administrative mechanism by which Velasco Lopez could have challenged his detention on the ground that it reached an unreasonable length. Detention under § 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded.[8] Absent release on bond, detention lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals, even where an individual has prevailed and the Government appeals. The longer the duration of incarceration, the greater the deprivation. Where the Supreme Court has upheld detention during the pendency of removal proceedings, it has been careful to emphasize the importance of the relatively short duration of detention. *See Demore*, 538 U.S. at 529 (noting the relative brevity of detention under

---

[8] Velasco Lopez was imprisoned for three and a half months before he received an opportunity to even apply for bail. Had he been charged with a violent felony such as murder or bank robbery, the Government would have been required, pursuant to 18 U.S.C. § 3142, to promptly bring him before a magistrate judge where the Government would have been required to carry the burden of establishing by a preponderance of evidence that no conditions of release would reasonably assure the defendant's presence at trial and by clear and convincing evidence that no conditions could assure the safety of the community. *See United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

§ 1226(c), which lasts roughly a month and a half in 85% of cases, and an average of four months in the minority of cases in which the noncitizen chooses to appeal). Velasco Lopez's incarceration had lasted almost ten times longer than the length of detention under § 1226(c) in the vast majority of cases, according to statistics relied on by the *Demore* Court. *Cf. Zadvydas*, 533 U.S. at 701 (holding that presumptive limit to reasonable duration of post-removal detention is six months). Had the district court not ordered a new hearing with a shifted burden, it is impossible to say how long Velasco Lopez's incarceration would have lasted. For these reasons, we conclude that the first *Mathews* factor cuts sharply in Velasco Lopez' favor.

## B.

The second *Mathews* factor, "the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," also weighs heavily in Velasco Lopez's favor. *Mathews*, 424 U.S. at 335. Procedural due process rules are shaped by the risk of error inherent in the truth-finding process. *Id.* at 344. At this stage in the *Mathews* calculus, the primary interest is not that of the Government but the interest of the detained individual. *See Hamdi*, 542 U.S. at 530. Here, the

procedures underpinning Velasco Lopez's lengthy incarceration markedly increased the risk of error.

First, those procedures seriously impacted his ability to secure bail. *See Moncrieffe v. Holder*, 569 U.S. 184, 201 (2013). During his first hearing on May 14, 2018, charges relating to the White Plains bar altercation remained outstanding and were a factor cited by the immigration judge when summarily denying bail one month later. As we have noted above, in the run-up to the May hearing, Velasco Lopez sought to resolve the White Plains charges but ICE declined to produce him for criminal court appearances related to the incident. When ICE finally did produce him, the charges were dismissed. Even where information relevant to bail was on file with the Government, Velasco Lopez struggled to obtain it. For example, ICE refused to provide Velasco Lopez with his own DACA records which were in the Government's possession and highly relevant.[9] In August 2018, after the White Plains charges had been dismissed, Velasco Lopez submitted, through counsel, a renewed bail application. *See* 8 C.F.R. §

---

[9] During the initial immigration proceedings, Velasco Lopez did not have access to relevant records about his DACA status and was unable to dispute the Government's evidence relating to the rescission of his DACA status. His attempt to obtain the records through discovery also failed, and he was not able to access them until his Legal Aid Society lawyer later obtained them through a Freedom of Information Act request.

1003.19(e). He was incarcerated another two months until he received a hearing on October 10, 2018. At that hearing the immigration judge requested the charging documents from his February 2018 arrest but found them unsatisfactory because they lacked specific information; they did not contain his blood alcohol level or indicate the reason why the arresting officer had stopped him. Citing the lack of information, the judge drew adverse inferences and again denied bail. Velasco Lopez was returned to prison and remained there an additional seven months until May 2019, when he was finally granted bail by an immigration judge.

Velasco Lopez was neither a flight risk nor a danger to the community but was unable to prove that was the case. His experience demonstrated the value for due process purposes of the burden-shifting required by the habeas court. In making the relevant inquiry, the Government had substantial resources to deploy. Those resources include computerized access to numerous databases and to information collected by DHS, DOJ, and the FBI, as well as information in the hands of state and local authorities. *See, e.g.,* 8 U.S.C. §§ 1373(a)-(b); 1357(g); 1644; *see also* Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017). Moreover, to the

extent the Government did not have the necessary information at its fingertips, it had broad regulatory authority to obtain it. *See* 8 U.S.C. § 1229a(c)(3).

The Government's arguments under this *Mathews* factor are unconvincing. The Government argues that the existing bond procedures allow an immigration judge to consider a variety of factors and that bond determinations are reviewable by the BIA. The Government also claims that in some cases it has little to no information about a detained individual. Perhaps so. But the longer detention lasts, the less persuasive this "lack of information" rationale becomes. After fifteen months, the Government had not found information sufficient to show that Velasco Lopez was a poor bail risk, and indeed, it was in possession of important information indicating the contrary. The error that fell on Velasco Lopez was addressed only once the significant resources of the Government were deployed. In short, the Government's "lack of information" contention is an inadequate justification for the indeterminate incarceration of an individual who did not pose a heightened bail risk.

Moreover, "as the period of . . . confinement grows," so do the required procedural protections no matter what level of due process may have been sufficient at the moment of initial detention. *Zadvydas*, 533 U.S. at 701. The

23

Supreme Court has indicated that "if the continued detention became unreasonable or unjustified," the Due Process Clause may entitle even those mandatorily detained under § 1226(c) "to an individualized determination as to his risk of flight and dangerousness." *Demore*, 538 U.S. at 532 (Kennedy, *J.*, concurring); *see also id.* at 532–33 ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."). Unlike those mandatorily detained under § 1226(c), persons subject to detention under § 1226(a) like Velasco Lopez include individuals with no criminal record, those who have known no country other than the United States, those who are or were protected by DACA and Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), international students with visa issues and lawful permanent residents who have lived in this country for decades, among others. *See also supra*, at 12 n.6. We believe that individuals subject to prolonged detention under § 1226(a) must be afforded process in addition to that provided by the ordinary bail hearing, just as the Supreme Court in *Demore* has suggested criminals subjected to prolonged detention under

24

§ 1226(c) may be entitled to further process. The bond hearing ordered by the district court mitigated the risk of error that this *Mathews* factor requires us to consider.

## C.

We turn now to the third factor in the *Mathews* analysis: "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. As the Government correctly notes, the Attorney General's discretion to detain individuals under § 1226(a) is valid where it advances a legitimate governmental purpose. The Government has identified its regulatory interests in detaining noncitizens under § 1226(a) as (1) ensuring that noncitizen do not abscond and (2) ensuring they do not commit crimes.[10] The importance of these interests is well-established and not disputed. *See Zadvydas*, 533 U.S. at 690; *Hernandez v. Sessions*, 872 F.3d 976, 990-91 (9th Cir. 2017) (recognizing validity of the Government's interests but holding that

---

[10] The Government also contends that it has an interest in the prompt execution of removal orders. While this contention is true, it is irrelevant. This case arises under § 1226(a), which occurs before a final removal order has been issued. The Government's interest in the prompt execution of removal orders against individuals who have not yet been deemed removable is not apparent to us.

immigration judges must consider a noncitizen's financial circumstances and appropriate alternatives to detention during bond hearings).

However, the Government has not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight. On the contrary, shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose.[11] The Government has not convinced us that requiring it to justify Velasco Lopez's detention by clear and convincing evidence substantially undermines its legitimate interests or entails an undue administrative burden. As noted, ICE and DHS can access the records of other federal agencies and local law enforcement and routinely do so for purposes of the merits proceedings. *See, e.g.*, 8 U.S.C. § 1229a(c)(3) (outlining criminal records permissible to establish deportability). Thus, the longer detention continues, the greater the need for the Government to justify its continuation.

---

[11] Detention costs taxpayers approximately $134 per person, per day, according to ICE's estimates. DEP'T OF HOMELAND SECURITY, U.S. Immigration and Customs Enforcement Budget Overview (2018) at 14; *Hernandez*, 872 F.3d at 996. On this calculus, Velasco Lopez's detention cost the taxpayers about $60,000.

As noted, "[i]n striking the appropriate due process balance the final factor to be assessed is the public interest." *Mathews*, 424 U.S. at 347. The public interest considerations include "the administrative burden and other societal costs that would be associated with" the additional process. *Id.* Again, this consideration cuts strongly in favor of Velasco Lopez. When the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time, as in this case, it separates families and removes from the community breadwinners, caregivers, parents, siblings and employees.[12] The Government articulates no public interest that any of this serves and we see none.

The purpose of habeas corpus is to impose limitations on the Government's ability to do these things. Habeas corpus, as the Supreme Court has said, is an "adaptable remedy," the "precise application and scope" of which changes "depending upon the circumstances." *Boumediene*, 553 U.S. at 779. The equitable and flexible nature of habeas relief also gives the reviewing court considerable latitude "to correct errors that occurred during the [prior] proceedings." *Id*. at 786; *see also Schlup v. Delo*, 513 U.S. 298, 319 (1995). While the Government's interest may have initially outweighed short-term deprivation of

---

[12] *See, e.g., Lora v. Shanahan*, 804 F.3d 601, 616, n.23 (2d Cir. 2015), *vacated*, 138 S. Ct. 1260 (2018).

27

Velasco Lopez's liberty interests, that balance shifted once his imprisonment became unduly prolonged. We conclude that Velasco Lopez's prolonged incarceration, which had continued for fifteen months without an end in sight or a determination that he was a danger or flight risk, violated due process. We further conclude that the district court appropriately addressed the violation by ordering a new hearing at which the Government was called upon to justify continued detention.[13]

## III.

We agree with the district court's conclusion that at Velasco Lopez's new bond hearing, a clear and convincing standard was appropriate.[14] A standard of

---

[13] This case does not require us to establish a bright-line rule for when due process entitles an individual detained under § 1226(a) to a new bond hearing with a shifted burden. On any calculus, Velasco Lopez's fifteen-month incarceration without a determination that his continued incarceration was justified violated due process. The Supreme Court has held that noncitizens who have been ordered removed for having committed serious criminal offenses or having a long criminal history cannot be detained indefinitely, and a presumptively constitutional period of detention does not exceed six months. *Zadvydas*, 533 U.S. at 701.

[14] This conclusion is the same one that numerous other circuit and district courts have reached. *See, e.g., German Santos v. Warden, Pike Cnty. Corr. Facility*, 965 F.3d 203, 213 (3d Cir. 2020); *Singh*, 638 F.3d at 1203–04; *Casas-Castrillon v. D.H.S.*, 535 F.3d 942, 951 (9th Cir. 2008); *Darko v. Sessions*, 342 F. Supp. 3d 429, 435–36 (S.D.N.Y. 2018); *Medley v. Decker*, 18-cv-7361 (AJN), 2019 WL 7374408, at *3 (S.D.N.Y. Dec. 11, 2019) (discussing the "overwhelming consensus" of judges in the Southern District on this issue), *appeal filed,* (2d Cir. Dec. 27, 2019); *Rajesh v.*

proof "serves to allocate the risk of error between the litigants" and must reflect the "relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423 (1979).

The Supreme Court has consistently held the Government to a standard of proof higher than a preponderance of the evidence where liberty is at stake,[15] and has reaffirmed the clear and convincing standard for various types of civil detention. *See, e.g., id.*, 441 U.S. at 426, 432–33 (upholding the clear and convincing standard for civil confinement of individuals with severe mental illnesses); *Salerno*, 481 U.S. at 751 (noting that pretrial detention is permitted "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identifiable and articulable threat to an individual or the

---

*Barr*, No. 6:19-cv-06415 (MAT), 2019 WL 5566236, at *6 (W.D.N.Y. Oct. 29, 2019) (joining the "vast majority" of district courts to hold that the Due Process Clause required the Government to bear the burden by clear and convincing evidence of justifying detention), *appeal filed*, (2d Cir. Dec. 27, 2019). District courts in other circuits have reached similar conclusions. *See, e.g., Brito v. Barr*, No. 19-cv-11314 (PBS), 2019 WL 6333093, at *4 (D. Mass. Nov. 27, 2019), *appeal filed*, (1st Cir. Feb. 10, 2020); *Hernandez-Lara v. Immigr. & Customs Enf't, Acting Dir.*, 19-cv-394 (LM), 2019 WL 3340697, at *8 (D.N.H. July 25, 2019), *appeal filed sub nom. Hernandez Lara v. Lyons* (1st Cir. Oct. 11, 2019).

[15] We agree with the Third Circuit that "[i]n ordinary civil cases, each side has the same skin in the game. So it makes sense to allocate the risk of error evenly between the two parties . . . . But when someone stands to lose an interest more substantial than money, we protect that interest by holding the Government to a higher standard of proof." *German Santos*, 965 F.3d at 213–14.

community"); *Foucha*, 504 U.S. at 75–76 (requiring the same standard for involuntary civil commitment); *United States v. Comstock*, 560 U.S. 126, 130–31 (2010) (noting the same standard in upholding the constitutionality of a federal statute which permits a continued confinement of a mentally ill, sexually dangerous prisoner beyond a date that the prisoner would otherwise be released); *see also Francis S. v. Stone*, 221 F.3d 100, 101 (2d Cir. 2000) (noting the same standard for civil commitments). The preponderance standard, the Supreme Court has noted, "creates the risk of increasing the number of individuals erroneously committed" and "it is at least unclear to what extent, if any, the state's interests are furthered by using [it]." *Addington*, 441 U.S. at 426.

The Government's claim that these precedents are inapplicable in an immigration context is unpersuasive. As one Justice has noted: "[n]owhere did we suggest that the 'constitutionally protected liberty interest' in avoiding physical confinement, even for aliens already ordered removed, was conceptually different from the liberty interest of citizens considered in *Jackson*, *Salerno*, *Foucha*, and *Hendricks*. On the contrary, we cited those cases and expressly adopted their reasoning, even as applied to aliens." *Demore*, 538 U.S. at 553 (Souter, *J.*, concurring in part and dissenting in part). Merely invoking the

30

fact that a case is raised in the immigration context does nothing to address much less to abrogate due process principles.

We believe that it is improper to allocate the risk of error evenly between the individual and the Government when the potential injury is as significant as the individual's liberty. Accordingly, we conclude that a clear and convincing evidence standard of proof provides the appropriate level of procedural protection. *See Singh*, 638 F.3d at 1203–04 (quoting *Addington*, 441 U.S. at 427). We therefore conclude that the district court's order requiring the Government to prove that Velasco Lopez is a danger to the community or a flight risk by clear and convincing evidence to justify his continued detention "strikes a fair balance between the rights of the individual and the legitimate concerns of the state." *Addington*, 441 U.S. at 431.

Finally, the Government contends that the relief Velasco Lopez secured is foreclosed by the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). This assertion is directly contradicted by the opinion itself. In *Jennings*, the Supreme Court rejected the argument that the text of various provisions of the INA can be read to give detained noncitizens the right to periodic bond hearings every six months, but it expressly declined to reach the constitutional issues.

31

Justice Alito, for the majority, stated that because the Court of Appeals "had no occasion to consider respondents' constitutional arguments on their merits . . . we do not reach those arguments." *Id.* at 851; *accord German Santos*, 965 F.3d at 210.

The irony in this case is that, in the end, all interested parties prevailed. The Government has prevailed because it has no interest in the continued incarceration of an individual who it cannot show to be either a flight risk or a danger to his community. Velasco Lopez has prevailed because he is no longer incarcerated. And the public's interest in seeing that individuals who need not be jailed are not incarcerated has been vindicated.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.